692

ACTIVATED SLUDGE, Inc., et al. v. SANI-
TARY DIST. OF CHICAGO.
No. 4280.

District Court, N. D. Illinois, E. D.
July 5, 1940.

Lynn A. Williams of Williams, Bradbury & Hinkle, and Warren C. Horton, both of Chicago, Ill., for plaintiffs.

Ernst Buehler, Edmund D. Adcock, and Ralph M. Snyder, all of Chicago, Ill., Arthur C. Denison, of Cleveland, Ohio, and Wallace R. Lane, of Chicago, Ill., for defendant.

LINDLEY, District Judge.

The court heard oral arguments on March 2, 1940, upon defendant's motion for leave to file a petition to reopen the decree of infringement entered herein February 8, 1935, submit allegedly newly discovered evidence, vacate the decree and dismiss the suit. Since that time, under permission of the court, voluminous briefs have been filed, the final and concluding memorandum having been received on June 25. The court has had complete access and recourse to the documentary and parol testimony contained in the voluminous record of the cause.

The issue presented is the same as if the petition had been filed and its sufficiency were attacked by motion to strike or dismiss. Defendant grounds its motion upon two premises: First, that the suit should be dismissed for the reason that it was inspired, filed and prosecuted through the action of one Dilling, formerly chief engineer of defendant, who, it is alleged, learned the facts concerning the vulnerability of defendant to patent litigation under the patents here involved while employed by defendant. The legal proposition relied upon is that one who, during the course of his employment, learns of vulnerability of his employer to litigation cannot, after his employment ceases, instigate prosecution of such litigation, whether his knowledge concerning the vulnerability be confidential or otherwise. The second contention is that Activated Sludge, Inc., plaintiff, who succeeded in the litigation culminating in the decree of infringement, did not have title to the patents in suit when it became party plaintiff or when the decree was entered and, being without title, if the facts had been presented, could not properly have succeeded.

In support of these two bases for relief, defendant avers that the facts supporting each were concealed by plaintiff and its counsel and came to the notice and knowledge of defendant only long after the entry of the decree and shortly prior to the filing of its motion. Consequently, defendant asserts it is not chargeable with negligence in failing to make earlier discovery and presentation of the evidence.

Plaintiff insists that defendant has not brought itself within the limitations imposed upon persons seeking vacation of a decree, rehearing or leave to file a bill of review, in that the allegedly newly discovered evidence was known to defendant or procurable by it at the time of trial and was not presented at the earliest practical moment after discovery and that at all events the evidence is immaterial and irrelevant to the issues and not of such character as to justify any action other than the decree entered. It disputes the correctness of the proposition concerning the lack of right of a former employee to take advantage of the vulnerability of his former employer, avers that the facts do not justify the conclusion that Dilling owed any duty to defendant at the time of his alleged breach of fiduciary obligation and that, even if the facts alleged concerning Dilling's acts were true, they are not such as to justify any rehearing. Each party submits subordinate propositions which will be noted in the course of this memorandum. The pertinent facts will be discussed in like course.

The petition tendered and leave to file which is asked is like in its legal connotation to the ordinary petition for rehearing, motion for new trial or bill of review and the rules governing each are the same. Any such application must disclose the new testimony, the names of the witnesses, if known, and if not, the means by which the evidence is to be procured, the character of the documentary evidence relied upon and the fact that the evidence has come to light since the hearing and was unknown and could not reasonably have been ascertained for use at the hearing. The evidence may not be merely cumulative. It must be such as would have been competent, relevant, material and of such character as would probably have changed the result reached. If it is apparent that the new facts were known in time for presentation at the hearing or reasonably ascertainable by the exercise of due diligence, the applicant cannot succeed. McLeod et al. v. City of New Albany, 7 Cir., 66 F. 378; Obear-Nester

Glass Co. v. Hartford-Empire Co., 8 Cir., 61 F.2d 31; National Brake & Electric Co. v. Christensen, 7 Cir., 278 F. 490; 21 C.J. 718, 719; J. B. Inderrieden Co. v. Gill, 373 Ill. 180, 25 N.E.2d 796.

Defendant's contention that plaintiff was without title rests largely upon the premise that plaintiff took its title as assignee of Activated Sludge, Limited, subject to an outstanding license previously granted Guthard. Defendant insists in this respect that the agreement with Guthard was in legal effect an assignment of title and that its subsequent cancellation and termination by Guthard did not thereby revest in Activated Sludge, Limited, the owner of the patents, any title which it could thereafter assign to plaintiff.

Bearing upon these contentions, it is necessary to observe that a suit similar to this, for infringement, in favor of the same plaintiff against the City of Milwaukee, was pending at all times after institution of this cause, the trial occurring in 1929, four years prior to that of the instant suit. Counsel for defendant in this trial participated actively in that trial also. There plaintiff proved its title, first by assignments by the original patentee to Activated Sludge, Limited, and then by assignment by the latter company to Activated Sludge, Inc., plaintiff. At that time the court received in evidence the license or assignment from Activated Sludge, Limited, to Guthard, and a modification thereof, both of which were later received in evidence by this court at the trial of this cause. This was the agreement which plaintiff contends was later terminated by Guthard's cancellation. That Guthard had made an express cancellation was known to all counsel, as formal cancellation appeared on the instrument. Furthermore the document bears a memorandum in the handwriting of counsel for defendant, raising a question as to whether such cancellation was sufficient to reconvey the title to Activated Sludge, Limited. The same exhibits were in evidence in this case. Consequently it was known long prior to the decree that plaintiff's title depended upon an assignment by Activated Sludge, Limited, made after cancellation of a prior limited assignment or license to Guthard. If there were any reason in law why such a cancellation did not revest in Activated Sludge, Limited, full title to the patents, that question arose immediately upon acquisition of knowledge of the fact. If plaintiff's title was defective because of an ineffectual attempt by Guthard to revest the title in his grantor, then plaintiff had no title and could not maintain the suit. But this knowledge was acquired as early as 1929, and certainly known to all parties in interest at least as early as the trial of this cause in 1934. The defense might have been properly presented at the trial and, if defendant was correct in its contention, the suit would then have been dismissed. It is too late now for this court to entertain any application to reopen the decree and hear additional testimony upon this question, existing at the time of the trial. The authorities cited are conclusive in that respect. But, in addition, defendant had the opportunity to examine the officers and beneficiaries of Activated Sludge, Limited, of Activated Sludge, Inc., and of Activated Sludge Processes of America, in the course of the trial. At no time did it seek discovery, present interrogatories, apply for subpoena duces tecum, take depositions or make other attempts to prove facts that would have thrown any additional light upon this question. It is too late now to assert that cancellation of the previously outstanding limited license or assignment was ineffective to reconvey title to Activated Sludge, Limited.

Dilling was at one time one of the beneficiaries of the rights received by Guthard by his limited license or assignment. He had, previously thereto, been chief engineer for defendant, and it is now asserted that he obtained knowledge as to defendant's infringement while he was its engineer and that after his connection with defendant had been dissolved, he proceeded to London, negotiated with the owner of the patents, and became a beneficiary in Guthard's rights. The fact as to his interest has, it is alleged, only recently come to defendant's attention, for the reason that at no time was it disclosed but was rather in fact suppressed by plaintiff.

In this connection the record shows that attorneys for Dilling, on January 7, 1936, notified defendant that their client had retained counsel for the purpose of prosecuting a suit to procure satisfaction of his claim against plaintiff arising out of his alleged interest in the patents and accruing because of defendant's infringement. This information was contained in an attorney's lien notice purporting to be served in order to protect Dilling's attorneys as to their fee against any private settlement be--

tween their client and defendant. But whatever its purpose or form, it put defendant on notice at that time that Dilling claimed an interest in the patents and in the right of action accruing from their infringement by defendant. Yet there is no showing in the petition or the evidence submitted that the District then took any steps to investigate Dilling's claim or to bring to the court's attention any facts as to his claim of title or sought in this cause the court's aid in discovering the true facts as to Dilling's interest, if any. There is no showing of any reason why the discovery might not just as well have been made at that time as three years later, if, in accord with the dictates of ordinary prudence, inquiry had then been instituted. It was too late to begin investigation in 1939 as to facts of which defendant was put upon notice three years before.

It appears further that Dilling filed a bill of complaint in the Circuit Court of Cook County against Guthard and his associates, including Activated Sludge Processes of America and Activated Sludge, Inc., wherein he claimed an interest in the patents and in the recovery for their infringement. That bill was a public record, and has been on file since October, 1936. Then, too, Dilling sent to defendant in July, 1938, another notice wherein he stated that the rights and ownership of Activated Sludge, Inc., were subject to the prior license agreement in which he, Dilling, had an interest and claimed that Activated Sludge, Inc., was in law trustee under that agreement for the rights and privileges growing out of it for the use and benefit of Dilling. He informed the parties of the title of the pending cause and the court in which it was pending. Again there is no showing by defendant that it did at that time, at the earliest practical moment, attempt to ascertain the truth or falsity of Dilling's claim. It is too late at this belated date, in the face of these circumstances, to insist that the evidence is newly discovered.

But defendant's proposed petition is defective in another respect. It does not present anything which, in view of the existing record in this cause, if offered to and received by the court, would in any way justify a change or alteration of the decree. The original bill was filed by Guthard and Activated Sludge, Limited, the original parties plaintiff, and therein it was averred that Activated Sludge, Limited, had acquired, by assignment from the original patentee, entire title to each and all of the patents involved; that thereafter it had granted to plaintiff Guthard the exclusive right and license to make, use and sell the inventions of the patents within four of the United States, including Wisconsin and Illinois, which was still in full force. The evidence shows that Guthard did in fact hold such a license or assignment, but that he had made an agreement with Dilling, Mayo and McCaleb that they should share with him in the fruits of the possession and title. But, during the pendency of the suit, an original bill in the nature of a supplemental bill was filed in 1927 wherein Activated Sludge, Inc., became the sole plaintiff and Guthard and Activated Sludge, Limited, were dropped as plaintiffs. They remained in the cause only as cross-defendants in defendant's counterclaim. In this supplemental bill, Activated Sludge, Inc., the only plaintiff, asserted that on February 24, 1927, subsequent to the filing of the original bill, Guthard, for a good and valuable consideration, had cancelled any and all agreements then existing between him and Activated Sludge, Limited, and terminated his interest in the patents; that thereby his interest and complete title had revested in one of the original plaintiffs, Activated Sludge, Limited; that subsequently, on the same date, the latter, for a good and valuable consideration, had conveyed all of its title to the patents to plaintiff Activated Sludge, Inc., a copy of which assignment had been recorded in the Patent Office, and that plaintiff held the entire title. The evidence disclosed the original limited license or assignment to Guthard and its cancellation, the latter of which stated that Guthard on January 27, 1927, agreed that all rights of every kind and nature granted to or held by him by virtue of the aforesaid instrument "shall be and are this date cancelled and terminated." The entire document and the cancellation were offered and received in evidence. Thus, as we have seen, defendant was even then in position to contend, if it thought proper, that the cancellation did not work a revesting of the title in Activated Sludge, Limited.

█ It appears that this cancellation was made because Guthard and his associates were indebted to various parties for moneys advanced, were not able to pay, and expected to receive, in exchange for sur-

render of their rights, 150 shares of the stock of plaintiff, which agreed to assume and pay the outstanding indebtedness. There had come into existence a socalled Massachusetts trust in which there were four beneficiaries, Dilling, Guthard, Mayo and McCaleb, under which Guthard was named as trustee. From the socalled articles under which said trust existed, Guthard apparently was the agent of the other interested parties. He called a meeting to act upon the proposal to surrender its rights. There is no showing that Dilling did not have notice of the meeting. He did not attend but the other three directors adopted a resolution authorizing an agreement releasing the trust's interest, in consideration of receipt of shares of stock in plaintiff. The resulting agreement recited that, whereas the trust was possessed of certain rights in the patents and indebted for services and disbursements therefor, the directors had been and were authorized to cancel the agreement and to receive therefor 150 shares of Class C stock of Activated Sludge, Inc., which would assume and pay the outstanding indebtedness. When this should have been done, the trust was to be deemed to have relinquished all rights and interests. A formal statement of cancellation and termination was executed. Thereafter Activated Sludge, Limited, Activated Sludge Processes of America and Activated Sludge, Inc., all treated the formerly existing contracts as cancelled and terminated. Neither the trust, Guthard nor Activated Sludge, Limited, thereafter asserted or attempted to assert any title to the patents or interest therein.

Even had the defendant at that time insisted that these facts were insufficient to revest in Activated, Limited, full title to the patents, it would have failed. If these facts had been presented to the court at the time of the trial, some seven years later, the only effect would have been to cause the court to determine whether plaintiff's title was good. To my mind, it is wholly immaterial whether the trust should be treated as a joint syndicate undertaking, as a common law trust or as a Massachusetts trust. The express agreement of the parties interested was that a three-fourths majority of the directors might act. This they did. Any and all parties interested were, after seven years, estopped to claim that the cancellation did not

effectuate what the parties treated it as effectuating.

■ Even were the cancellation ineffective to reconvey the legal title, the facts and circumstances were such that equitably the contracts were at an end and the legal and equitable interests of any and all character in and to the patents thereafter resided in Activated Sludge, Limited. This court, as a chancellor, would not then have permitted and cannot now permit it to be said by defendant that the action of the parties was not effective to reach the end which they sought to reach. It is quite the general rule that where a written instrument has been redelivered and surrendered to the assignor with the agreement that the original assignment shall be void, this operates at least in equity as a reassignment. In such case, where the instrument is redelivered to and remains in the possession of the assignor together with its formal cancellation he may recover without proof of formal reassignment to him. No matter what the language, no matter how informal or inapplicable it may seem, if the cancellation and the surrounding circumstances show clearly an intention of the parties to effectuate a transfer supported by a valuable consideration, with redelivery, thereby equitably at least a retransfer is effectuated. 5 C.J. 938; In re Kenny, D.C., 269 F. 54; Ruple v. Bindley, 91 Pa. 296; Moeser v. Schneider, 158 Pa. 412, 27 A. 1088.

■ If Dilling had any right to object that he had not been treated fairly by his associates that was no affair of defendant; that was a question between him and his associates, and if they could not agree, for the court, to determine whether Dilling had effectively disposed of his interest and dropped out, as contended by plaintiff, or whether he had retained an interest as contended by him.

From the time of the cancellation and redelivery, acquiesced in by all the interested parties, Activated Sludge, Limited, was owner of the patents and might properly, as it did, assign them to plaintiff. Consequently there was no other necessary party plaintiff and even if the evidence were received at this belated date, it would be wholly insufficient to justify the court in vacation of the decree.

Dilling was engineer of defendant from December 16, 1920, to July 21, 1922. The

Des Plaines plant was completely designed and under construction before his employment began. The inclusion of infringing features in this construction, therefore, could not have been due to Dilling. The Calumet plant, likewise found to infringe, was also designed prior to Dilling's connection with the District. The plans, adopted before he became identified with defendant, included use of the activated sludge method. The plant was started in 1920. The decision to use the activated sludge treatment in this as well as the Des Plaines plant was made and the drawings prepared and construction commenced before Dilling became connected with the District. The third plant found to infringe was the North Side Sewage Treatment plant. In the record appears an article by Edward J. Kelly, chief engineer, published March 11, 1926, in which the author stated that excavation for the North Side plant was started in September, 1923. This was long after Dilling had ceased to be chief engineer, July 21, 1922. During the building and operation of the plant constituting infringement, Dilling was not connected with the District. Prior to his retirement from the office, the Board of trustees had considered the project and had referred the question of character of plant to be built to a commission of well known sanitary engineers, Eddy, Fuller and Hatton. They made a report recommending the activated sludge method for the North Side plant, containing some 100 pages and constituting a part of the public records of the Sanitary District. It was before the court at the time of the trial and Hatton testified that when the report of February 27, 1922, was made by the commission, the members had considered three different characters of plant and that after "long examination and consideration, the commission, of which I was a member, decided that the activated sludge process was best adapted to that condition." The inspiring cause for adoption of the activated sludge method was this commission's report.

Hatton was also chief engineer of the Milwaukee Sewage Commission. He knew about the activated sludge method. He had long corresponded with the original patentee. He was acquainted with the details of the invention disclosed in the patents and apparently had attempted to induce Milwaukee Sewage Commission to procure a license under the patents. He had been even largely responsible for procuring numerous affidavits of American sanitary engineers, filed with the Commissioner of Patents, in an effort to prevent their original issuance. Consequently, he was in position, as a member of the commission, to give to defendant all of the information existent upon the method and the patents. Undoubtedly Dilling had been consulted in the preparation of the plans and after the report of the commission his office probably proceeded with the preparation thereof, but the commission recommended the method and he left before the work was inaugurated.

That both the Milwaukee Commission and defendant entered upon use of the activated sludge processes with their eyes open and that adoption of those processes sprung not from Dilling's brain, but from others, prior to his employment, is further apparent from the correspondence between Hatton, member of the commission recommending the processes to the District, and the English owners of the patents involved through the years 1914 to 1921. On November 19, 1914, Hatton wrote Activated Sludge, Limited, that his commission was unable to enter into any tentative contract until further developments. On July 13, 1915, he was advised that the American patents, application for which were then pending, covered certain apparatus and methods and that it was the intention "to work these American patents" through a syndicate with the head office in the states but that the time was not yet right and that in the meantime the owners would grant Milwaukee a license for its first plant for a nominal sum. On July 31, 1915, Hatton wrote that if the activated sludge process should be adopted and result in infringement then the time would be right to discuss royalties. He requested copies of the patents and said again on August 18 that he would give consideration to them "when the right time comes." On January 14, 1916, he again wrote that the district had concluded that it would take the matter up only when it had decided to install the activated sludge process, if the United States patents were granted. Copies of the British patents and the American applications were mailed to him from time to time. On March 22, 1916, he was advised of a new offer of royalty,—1½ per cent of the actual outlay, and on April 15 he replied that until the patents should be granted in America, he must take the stand that the claims could not be

substantiated. On May 15, 1916, the commission advised the Englishmen that the matter of royalty had been postponed until the patents should be issued. On June 20, 1916, the offer of a license was withdrawn. On April 14, 1918, Hatton wrote that his commission considered the terms of the proposal "far from modest." On February 28, Activated Sludge, Limited, wrote Hatton offering Milwaukee a license for its first plant for $25,000. Hatton on June 1, 1921, promised to submit the matter. On June 28 the Activated Sludge, Limited, wrote that the time limit was suspended and on January 16, 1922, that it feared it could not further extend the time for acceptance. On January 24, 1922, Hatton wrote that the commission was not inclined to consider royalties at that time and on March 10, 1922, the offer of license was withdrawn.

Many, if not all of these facts were communicated to defendant district on July 21, 1921, when Hatton reported to it that in the year previous the Milwaukee Commission had sent him to England to inspect various methods of sewage disposal, it having had for some years notice from Activated Sludge, Limited, of London that that company was asserting against it liability for royalties for the use of the processes involved in activated sludge sewage disposal and of machinery and equipment used for that purpose. He stated that he had entered into negotiations with Activated Sludge, Limited, for a license, receiving a proposal which he had submitted to the Milwaukee commission, which had finally determined not to pay any royalty until the validity of the patents involved had been determined. He solicited the cooperation of the defendant district in full and complete investigation of the patents. At the same time Pearce, sanitary engineer of the District, informed defendant that patent notices had come to the Sanitary District and were in the files of its engineering department and that he had ordered from Washington, copies of all patents issued and relating to activated sludge.

The published proceedings of the Board of Trustees of the defendant district show that on December 1, 1916, the district adopted a preliminary report by Engineer Pearce to the effect that drainage waste could best be handled by the activated sludge process so as to produce an effluent suitable to discharge into the main channel of the district's drainage canal. On April 16, 1917, Pearce, speaking for the engineering committee, reported that in making certain recommendations, it had considered only the activated sludge process and that in its judgment the application of such process offered the best promise of solution of the stockyards sewage problem. It recommended that preliminary sketches be expanded and detailed plans prepared. On August 14, the Board appropriated moneys to construct an experimental activated sludge plant. On August 15, work was started on this plant and it was completed ih October and put in operation in November, handling 150,000 gallons of activated sludge daily through the year 1916. On April 11, 1918, the engineering committee reported that the then chief engineer had nearly completed the preparation of plans and specifications for the Des Plaines River sewage plant. In 1919 the preparation of plans and specifications for the Calumet plant was in progress. The same year, president of defendant reported that "for nine years" the district had conducted experiments and proved conclusively that pollution could be stopped by the activated sludge treatment. On March 27, 1919, the plans and specifications for the Des Plaines plant were finally approved and the clerk ordered to advertise for bids for construction. These bids were opened April 24, 1919, and examined by the committee, and on May 1, 1919, the contract was let and the bond approved. This contract provided that the contractor should protect the district against suit for infringement of patents except as to claims for infringement of patents covering the activated sludge process or machinery and equipment used in connection therewith. All similar contracts made thereafter contained a similar clause.

The record thus discloses that the general plan of using the activated sludge treatment had been recommended to defendant as early as November, 1916, and an employee of the District testified at the trial that the work on the Des Plaines or North Side plants were carried out in accordance with these recommendations.

The petition does not disclose that during the time he was with the District, Dilling was employed by the District in any effort to secure a license from the owner of the patents, though their existence was known, but shows that his employment consisted of performing duties of chief engineer. He had the assistance of a sanitary en-

gineer and others, but the installation of activated sludge infringing devices and methods was not initially inspired or carried out by him. The record does not disclose that anything within his knowledge was used in any way as a basis for the prosecution of defendant for infringement or in evidence resulting in the decree. Rather the facts relied upon to constitute infringement were shown by the plants themselves, open to the public, by the equipment therein, by the methods of operation thereof, all as disclosed by various publications, including an article by Mr. Edward J. Kelly on "Progress of Sewage Disposal in Chicago," a pamphlet reprint of an article published in the Engineering-News Record, a pamphlet entitled "Engineering Works"; a reprint by defendant of an article by Langdon Pearce in the Engineering News-Record, photographs of the plants and similar evidence. The exhibits used were available to the public. None of them was confidential and all might have been procured from public sources. There is no showing that any evidence was procured through Dilling.

The direct question is whether Dilling, who, for a comparative brief interlude, due to the changing political complexion of the board of trustees of defendant district, was employed as chief engineer and who, while he was there, knew as any member of the public investigating could have known, that two plants were utilizing the invention of the patents and having seen that a third plant, under the recommendation of a commission of well known engineers, would employ the same inventions, owed a duty to defendant not to become interested in the patents covering the activated sludge process, within a few months after his discharge. According to the averments of defendant and as it claims it has learned since, Dilling went to England shortly after he left the District. There he became interested as a one-fourth holder of a license or assignment for four states, including Wisconsin and Illinois, made to Guthard. Apparently after 1927 he was given no consideration by his associates and, apparently, thereafter he made no move or claim until in 1936, after the decree of this court had been entered, he filed suit against his former associates to obtain a share in the recovery that might be realized by plaintiff against defendant in this action. Whether he had a valid claim or whether he was making a nuisance of himself, to

my mind, is wholly immaterial. Even if he were legally entitled to a share of the money, the question is whether, because of that fact the failure to disclose his interest invalidated plaintiff's decree. I cannot attribute fraud to plaintiff in concealing the alleged interest of Dilling, for apparently plaintiff and Dilling's former associates have at all times earnestly insisted that he had no interest, and apparently considered his interest wiped out. With the title to the patents reassigned, I cannot attribute fraud to plaintiff in failing to volunteer to the court that Dilling had at one time claimed to have an interest or in failing to say that it anticipated that he might thereafter claim an interest.

If Dilling were an interested party, if he were legally entitled to a one-fourth interest and if he were present as a party holding such interest, what effect would these facts have had upon the decree, if tendered at the time? When Dilling entered the District's employment the latter had already committed the infringement at Des Plaines and Calumet. Nothing that it or anybody else could do thereafter could alter the fact. After his retirement, the District committed the third act of infringement in the North Side plant, but nothing that anybody might do could change the fact of that infringement, after it had once been committed. Was Dilling then barred from attempting to get an interest in the patents? After the infringement had taken place, partly before he became connected with the company and partly after he left its employment, was he barred from negotiating with the owner of the resulting cause of action for an interest therein? If, knowing of the infringement, he had proceeded to London and bought the patents without advising their owner of the existing infringement; if he had closed the eyes of the owner to the infringement and thereby obtained for a small consideration from the owner patents which gave him the right to prosecute for the concealed infringement, the owner of the patents might well have had cause to complain. But the owner knew, even if it did not know of the actual infringement, that activated sludge plants had been built in Milwaukee and Chicago; it knew that a cause of action could be asserted. What duty to the District did Dilling violate? When he left the company a cause of action existed against it for its own trespasses. Was he barred from becoming a part owner

of that cause of action? I do not so read the authorities. Had Dilling been employed by the defendant to negotiate with the owner of the patents for a license; had he attempted to sell to some persons, trade secrets obtained in a confidential manner while in the employ of defendant, the law would clearly afford defendant a remedy. But the infringement, cause of action for which existed in the patentee, was apparent to him who observed. It could be ascertained from an examination of the plans, the plants and the public documents. The District's liability to the patentee was the same before Dilling's attempt to become interested therein as it was afterward. The purchase by Dilling of an interest did not increase the liability or obligation of defendant. They were the same after his attempt to purchase as before, and nothing that Dilling did or said could increase or lessen its liability for infringement. What Dilling did affected defendant in no wise but affected only the interests of those who were entitled to recover; with that defendant is not concerned. Defendant was deprived of no defenses. Plaintiff's remedy was in no wise affected by Dilling's act. Cases involving the violation of a fiduciary duty help us not at all. One who leaves the employment of another has the right to take with him all the skill acquired and all the information he has received, so long as he takes nothing that is the property of the employer. Garst v. Scott, 114 Kan. 676, 220 P. 277, 34 A.L. R. 395. The latter phrase is the key to the solution. If the employee takes nothing belonging to his employer, he is free to act, and, as pointed out, Dilling took nothing except knowledge of the infringement which was in no wise confidential, lessened in no wise defendant's defense and increased in no wise its obligation.

I conclude, therefore, from the face of the record that defendant has not shown proper diligence; that it has not disclosed the allegedly new testimony, the means of procuring same or the names of witnesses; that it could, by reasonable diligence, have ascertained everything that it now seeks to ascertain before and at the time of the trial or shortly thereafter and finally that the new evidence is not competent, relevant or material, and that if it were produced and received it would in no wise justify a reopening of the decree.

I do not find that the witnesses Mayo and Guthard gave false testimony. Their testimony related to events occurring a number of years before the time when they testified. They were somewhat uncertain but I find nothing intentionally false. Clearly, they testified to nothing that would justify a rehearing.

Accordingly the motion for leave to file the application is denied.