COMMUNITY COUNSELLING SERVICE, INCORPORATED, Appellant,

v.

Robert Benedict REILLY, Appellee.

No. 8683.

United States Court of Appeals Fourth Circuit.

Argued Oct. 5, 1962.

Decided May 1, 1963.

Walter J. Bonner, Washington, D. C. (Michael F. X. Dolan, Washington, D. C., and Albert H. Buschmann, Jamaica, N. Y., of counsel, on brief), for appellant.

Raymond W. Bergan, Washington, D. C. (Edward Bennett Williams, Williams & Stein, and Harold Ungar, Washington, D. C., on brief), for appellee.

Before SOPER, HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

Community Counselling Service, Inc. sought an accounting from a former salesman-employee based upon allegations of disloyal promotion of his conflicting interests prior to the termination of his employment. The defendant, Reilly, filed a counterclaim seeking the recovery of salary and commission payments which the employer had withheld as an offset against its claim.

Tried by the Court without a jury, the Court declined to consider as substantive evidence admissions by Reilly in a pretrial deposition, and concluded that CCS had failed to sustain its burden of proof. We think that Reilly's admissions in his deposition should have been considered as substantive evidence, and, giving consideration to those admissions, that CCS was plainly entitled to judgment.

CCS is a professional fund raising organization, working principally for Catholic parishes and institutions. Reilly,

without prior experience in this type of professional fund raising, was employed by CCS in March 1957. Assigned as an associate director, he assisted in the conduct of a campaign and later, as a director, conducted campaigns to which he was assigned by CCS. In 1959, Reilly indicated an interest in a transfer from the operations division to the sales division of CCS. The transfer was effected, and, on July 1, 1959, Reilly became regional sales representative of CCS for the area between the northern boundary of Maryland and Georgia. As such, he was expected to seek out likely prospects and to convince them of the desirability of use of the services of CCS. He worked under the direction of CCS's sales manager in New York, to whom he was required to submit daily reports. He was assisted by his employer's distribution in the area of promotional materials and advertisements which featured Reilly as its regional representative who should be contacted by interested persons.

Campaigns for which Reilly secured contracts were not conducted by him or anyone in the sales division, but by the employees in the operations division.

For his services as regional representative, Reilly received a salary of $140 per week, plus commissions on an ascending scale, based upon sales in his area cumulated over the period of each year.

For a period of three weeks in November 1959, Reilly was temporarily assigned to operational work in Florida. Upon his return to the District of Columbia area and his resumption of his duties as Regional Representative, he failed to submit the written daily reports of his activities which were required of him.[1] The plaintiff's sales manager requested the resumption of daily reporting, but such reports were not forthcoming.

On January 4, 1960, Reilly presented himself at the New York office of CCS, and there informed the Vice President in charge of sales that he intended to resign.[2] As the reason for his resignation, he stated that he wished to earn more money, that he wanted to do less travelling, and that his wife was ill. He stated that he thought he would go back to work for the federal government or into teaching, in which he had experience. The next day he wrote a formal letter of resignation, in which he stated that he was acting because of "urgent personal reasons."

The contract of employment required thirty days' notice of termination, but it was agreed on January 4, 1960 that Reilly's resignation would be effective as of January 29, a Friday.

Before the end of January 1960, a letter from the Archbishop of the Roman Catholic Archdiocese of Washington was received by CCS in its New York office. In this letter, the Archbishop stated that St. Ambrose Parish had already engaged the services of CCS for a campaign, and that two other campaigns were in the offing, and, if those eventuated, they would be in touch with Reilly as Regional Representative of CCS. Because the New York office had heard nothing from Reilly of the St. Ambrose Parish campaign, it asked Reilly to come to New York on January 25.

CCS's Vice President in charge of sales testified that at the conference in New York on January 25, he inquired of Reilly about St. Ambrose Parish. Reilly responded by saying that Monsignor Brown of St. Ambrose did not want the services of CCS but he wished those of Reilly.

---

1. There were some telephone conversations with his superior about his work. His last written report was dated October 30, 1959. While engaged in the conduct of the campaign in Florida during November no reports were required of him. After termination of his employment, Reilly submitted a cumulative sales report containing references to his contacts with St. Ambrose Parish. Before that report was made, however, the defendant had firmly secured the St. Ambrose campaign for himself, as will later appear.

2. Reilly admitted that in November he had given serious consideration to leaving CCS's employ.

To the suggestion that until the end of the month he was obligated to undertake to sell the services of CCS rather than his own, he responded, according to the Vice President, "Do you expect me to walk out of here next Friday and not have a job?" [3]

According to the Vice President, during the January 25th conference in New York Reilly also stated that Father Cahill and Monsignor Kennedy, pastors, respectively, of Our Lady of Mercy Parish and the Parish of St. John the Evangelist, wished him to run campaigns for their parishes.[4]

There is no doubt but that Reilly actually conducted a campaign for Monsignor Brown's St. Ambrose Parish, commencing on February 8, 1960 and lasting into March. Reilly conducted a campaign for Our Lady of Mercy beginning in March 1960 and lasting until April. He conducted a campaign for St. John the Evangelist beginning in May 1960. For these three campaigns, respectively, he received fees of $6,720, $3,840, $6,720.

Though the campaign for St. Ambrose Parish actually began on February 8, 1960, Reilly, at the trial, testified he had not reached an agreement with Monsignor Brown, of St. Ambrose, until sometime after January 30. In his pretrial deposition, he had clearly and unequivocally testified that he had agreed to run the St. Ambrose campaign on some date between January 10 and January 29. Monsignor Brown, as a witness at the trial, testified that he had agreed with Reilly in January that Reilly would conduct the St. Ambrose campaign after the first of February or "at such time as he would be free to do it," or "after he got rid of the contract with the CCS people."

Reilly, as CCS's sales representative, had been in touch with Father Cahill, of Our Lady of Mercy, in October 1959.

Father Cahill was undertaking the formation of a new parish and was interested in procuring the services of CCS. Because of conflicting campaigns, however, he did not obtain permission of the Archbishop to actually conduct the campaign until sometime after the end of January 1960. Meanwhile, he remained in touch with Reilly. Father Cahill testified that early in 1960 he learned from Reilly of Reilly's intention to leave the employ of CCS. He testified that there may have been discussions between him and Reilly regarding Reilly's availability to conduct the campaign for Our Lady of Mercy.

According to the testimony for CCS, Reilly spoke on January 25th of the fact that Father Cahill wished him to conduct the imminent campaign for Our Lady of Mercy.

Reilly had also been in touch with Monsignor Kennedy and Father Gillen, of St. John the Evangelist. The priests had decided upon a campaign which, in October, 1959 was tentatively planned from February 1 to April 8, 1960. Reilly's report of October 6, 1959 indicated that CCS's success in conducting a campaign for Monsignor Russell, at Wheaton, Maryland, had sold the priests upon CCS and upon the effectiveness of its services.

Father Gillen, the Assistant Pastor of St. John's testified that in October of 1959 they had sought to have Reilly, himself, conduct the campaign, Reilly then explained he was exclusively engaged in sales work and could not conduct it himself, but that a good director would be furnished for that purpose. Father Gillen testified that he did not know Reilly had left the employ of CCS until sometime after January 1960, but the Pastor of the Parish, Monsignor Kennedy, did not testify, and there is the actual fact that Reilly did conduct the campaign when the Archbishop author-

---

3. Reilly testified that it was "possible" he had made such a statement.

4. At this meeting, Reilly delivered to CCS a signed contract for a fund raising campaign for St. Edwards Parish in Balti-

more. That he may not have sought that campaign for himself, however, does not dissipate the affirmative evidence, buttressed by his own admissions, that before termination of his employment, he did seek others for himself.

ized St. John's to proceed and the testimony of CCS that on January 25, 1960 Reilly stated that Monsignor Kennedy wanted him, not CCS, to conduct the campaign. More importantly, in his deposition Reilly admitted that "it is possible" that prior to January 29, 1960, he entered into a firm agreement with Monsignor Kennedy to run the campaign for St. John's.

## I

The District Judge was misled when he excluded Reilly's pretrial deposition and refused to consider, as substantive evidence, the very damaging admissions it contained.[5]

■ Unquestionably, the general rule is that the pretrial deposition of a witness on the stand is not admissible as substantive evidence. The pretrial statement is usable on cross-examination, for purposes of impeachment, to present earlier, contradictory statements, but it is not substantive evidence of the truth of the extra-judicial statements.

■ The pretrial deposition of a party, however, though the party is a witness at the trial, stands upon a different footing. Rule 26(d) (2) of the Federal Rules of Civil Procedure specifically provides that the "deposition of a party * * * may be used by an adverse party for any purpose." It has been consistently held that the Rule permits a party to introduce, as part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there.[6] Thus applied, the Rule is a restatement of the long recognized rule of evidence that statements of a party which are inconsistent with his claim in litigation are substantively admissible against him.[7]

■ It follows that Reilly's deposition should have been received in evidence when it was offered, and the admissions it contained should have been considered as substantive evidence in the case when the Court performed the process of fact finding.

When the admissions come from the sworn testimony of the party, transcribed by an official reporter, there is little room to question their veracity. There has been no effort to do so here, for there is no suggestion here that Reilly did not testify as reported in the transcript of his deposition testimony. Nor did Reilly offer any acceptable explanation of his deposition admissions. In considering the evidence, therefore, the great weight of Reilly's deposition admissions should have been recognized.

## II

Considering Reilly's deposition with all of the other testimony, it is unmistakable that, before termination of his employment by CCS, Reilly not only formed the intention of engaging in fund raising activities on his own account, but he actively sought employment for himself and entered into firm agreements on his own account, with the result that there was no substantial hiatus between the termination of his employment by CCS and the commencement of the first of the three campaigns that he had lined up for himself.

■ There is no claim here that there was any inhibition upon Reilly's engage-

---

5. The deposition was not only excluded, but in concluding arguments, when counsel sought to refer to one of its most obvious admissions, the Court declared, "Not a part of the record in this case."

   When, during a hearing of a motion for judgment notwithstanding the verdict, the question arose again as to whether the Court had considered Reilly's deposition admissions as substantive evidence, the District Judge stated:

   "The Court of Appeals is going to have a wonderful opportunity to state specifically

depositions are to be used in evidence in this circuit * * *."

6. See Pursche v. Atlas Scraper and Engineering Co., 9 Cir., 300 F.2d 467; Cleary v. Indiana Beach, Inc., 7 Cir., 275 F.2d 543; Merchants Motor Freight v. Downing, 8 Cir., 227 F.2d 247; Barker v. New, D.C.Mun.App., 107 A.2d 779. See also 4 Moore's Federal Practice (2d ed.) § 26.29, p. 1190.

7. See IV Wigmore on Evidence (3d ed.) § 1048 et seq.

ment in competitive activities after the termination of his employment with CCS. The usual rule is that a former employee, after termination of his employment, may compete with his former employer, the only restraint being that he may not use confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to his employer.[8] There is no suggestion here that CCS had any trade secrets which ought not to be utilized by Reilly in competing with it, and, since there was no covenant not to compete, Reilly had a clear and unrestricted right to compete after January 29, 1960.

Though it is plain that Reilly after January 1960 could have solicited for himself the business of St. Ambrose, Our Lady of Mercy and St. John's, he had absolutely no right to do that before January 29, 1960, when he was employed by CCS to solicit the business of those and other parishes for CCS and not for himself. That was the sole purpose of Reilly's employment. His great and primary duty as an employee was to sell the services of CCS and to promote its interest, and, when, during his employment, he solicited the business of the three parishes for himself, he was untrue to his employment obligation and was disloyal to his employer.[9].

Employment as a sales representative demands of the employee the highest duty of loyalty. It is not without its difficulties when the employment continues after the employee has arrived at a fixed determination to leave his employment, for then his interests and those of

his employer have lost their identity and may have become conflicting. Until the employment relationship is finally severed however, the employee must prefer the interests of his employer to his own. During such a period, he cannot solicit for himself future business which his employment requires him to solicit for his employer. If prospective customers undertake the opening of negotiations which the employee could not initiate, he must decline to participate in them. Above all, he should be candid with his employer and should withhold no information which would be useful to the employer in the protection and promotion of its interests.

Reilly's conduct was far short of the standards by which he should have governed himself.

It is quite irrelevant that the three parishes may not have been in position to actually commence their campaigns before the effective date of Reilly's resignation from his employment by CCS. The substantial fees which he collected for the conduct of the three campaigns were not the fruit solely of his efforts in aid of the campaigns after they commenced, but the fruit also of his disloyal conduct during his employment in soliciting the valuable contracts for himself when he owed an unequivocal duty to solicit those contracts for his employer. The fruit of that disloyal conduct Reilly may not retain.

It thus appears that CCS was clearly entitled to the accounting it sought of its former employee and it was improper on this record for the Court to have entered a judgment in Reilly's favor. The judg-

---

8. See, e. g., Safeway Stores, Inc. v. Wilcox, 10 Cir., 220 F.2d 661; Activated Sludge, Inc. v. Sanitary District of Chicago, N.D.Ill., 33 F.Supp. 692, aff'd. sub nom. Guthard v. Sanitary District of Chicago, 7 Cir., 118 F.2d 899; Sarkes Tarzian, Inc. v. Audio Devices, Inc., S.D., Cal., 166 F.Supp. 250. See, generally, 35 Am.Jur., Master and Servant, § 99, p. 527; Restatement (Second), Agency, § 396, p. 223.

9. An agent cannot place himself in a position where his own interests are or may

become antagonistic to those of his principal. Keiser v. Walsh, 73 App.D.C. 167, 118 F.2d 13; Commonwealth Finance Corporation v. McHarg, 2 Cir., 282 F. 560; Witmer v. Arkansas Dailies, 202 Ark. 470, 151 S.W.2d 971; Ritterpusch v. Lithographic Plate Service, Inc., 208 Md. 592, 119 A.2d 392; United Board & Carton Corporation v. Britting, 63 N.J. Super. 517, 164 A.2d 824; Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237.

ment below is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

The late Judge MORRIS A. SOPER expressed his approval of the result of the foregoing opinion, but died before the opinion was prepared.