[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action has been brought by the named plaintiffs, Eugene Sammartino (to be referred to hereafter as the plaintiff), his. wife, Christine Sammartino, FRI Land Equities, Inc. and Tiger-Lee Construction Co., against the defendant, Walter Tabor, a former employee, to recover the proceeds of the sales of three building, lots in the town of Coventry which they allege were wrongfully withheld and retained by him while he was still employed by the plaintiffs. The complaint consists of three counts, the first of which seeks money damages from the defendant for his claimed breach, of the employment relationship between the parties, the second, for compensatory and punitive damages for fraud, and the third count which seeks to impose a constructive trust on the proceeds of the sales of the three lots as well as those of other sales made after CT Page 2929 the termination of Tabor's employment
The following facts are either admitted by the defendant in his answer or are otherwise substantially undisputed. The defendant, Walter Tabor, was a salaried employee of Tiger-Lee Construction Co. for approximately eight years until August 22, 1991, when his employment was terminated because of the circumstances which are the subject matter of this action. The Sammartino business enterprises were owned and controlled exclusively by the plaintiff and his wife (despite the fact that in August of 1990 Tabor was given the honorific title of "vice-president" for which he was given an additional $165.00 per week for a period of time "to cover his expenses" according to Christine Sammartino) and included a real estate agency as well as the defendant land development corporations, all of which were housed in the same building on Route 6 in the town of Andover.
The relationship between the parties was described by the plaintiff as being more like that of father and son than that of employer and employee and he stated that he considered the defendant to be his "alter ego." The defendant also testified that his "life was bound up" with the lives of the Sammartinos, that he was "heartbroken" and found it difficult to "sit in court and talk about" the circumstances that led up to the breakdown of their close personal relationship and the institution of this lawsuit because it was "the worst thing" that had ever happened to him.
The fact that the terms and conditions of the defendant's employment were also very informal, to say the least, is reflected in the plaintiff's testimony that he was not sure what the defendant's salary was and that no time records were kept for payroll purposes, but that he was expected to make himself available at all times and to work as many hours as were necessary to get his work done and that he was not paid for overtime. The defendant acknowledged that he received "very generous" Christmas bonuses almost every year during the time when the profits from the plaintiff's enterprises permitted such payments, but that by January of 1992 the business climate had changed and in order to cut costs, the plaintiffs discontinued what they considered to be an expense reimbursement to the defendant of $165.00 per week that he had been receiving after he had been designated as a corporate "vice president" in August of 1990.
The defendant offered evidence to show that he was a corporate officer in name only during the last year of his employment, and in CT Page 2930 his testimony at the trial the plaintiff acknowledged that Tabor was never a shareholder or director of any of the Sammartino corporate enterprises. Nevertheless, the normal duties of his employment included the exercise of important managerial responsibilities over ongoing projects as well as the preparatory work necessary to obtain building and zoning permits and approvals in connection with the acquisition of real estate for the purposes of development or resale.
In January of 1991, the plaintiff assigned to the defendant the task of investigating the feasibility of developing certain undersized non-conforming "lake lots" in the town of Coventry owned by Kimberly and Joseph Nevers. After the defendant had completed his examination and review of the land records and the town's building and zoning requirements, he told the plaintiff that the undersized lots which comprised the Nevers property could be combined so as to qualify for a special exception under the Coventry regulations as an approved building lot, and he also told his employer that there were many other such "lake lots" that could be converted into approved building lots in the same manner.
A purchase agreement between the sellers and the plaintiff was signed on January 16, 1991 at a price of $15,000, and the application for approval was pursued successfully through the zoning board of appeals by the defendant acting on behalf of his employer. A salesperson in the plaintiff's real estate agency found a purchaser, Michael Block, for the approved lot at a price of $30,000, and the purchase by the plaintiff and the resale of the lot to Block at the higher price occurred virtually simultaneously, thereby permitting the plaintiff to make a substantial profit without incurring any out of pocket expenses other than the nominal deposit that he paid to the owners under the purchase agreement.
Michael Block, the purchaser of the Nevers lot, testified that after the closing he was told by the defendant that there were many more properties on the lake that could be similarly approved and sold for development, and that Block responded by saying that he would be interested in buying all of them. Thereafter, in the course of negotiating the sale of three such parcels, Block had many other conversations with the defendant in the course of which he told Block that he was being treated unfairly by the plaintiff because although he was "doing all the work" the salespersons in the plaintiff's real estate agency were being paid more than he was. CT Page 2931
Block also testified that the defendant told him that he was about to lose his home and that the plaintiff "was going to help him get out of that bind" with the proceeds of the sale of the three parcels to Block. It was Block's understanding that the defendant was acting at all times for the plaintiff in negotiating the sales of the three lots even though the defendant told him that the agreements would be in Tabor's name and that Block should call him at home rather than at work in connection with the sale of the lots.
Prior to the closing on August 14, 1991, Block attended a meeting of an association of lakeside property owners at which the defendant stated to the group that he was not, and never had been, affiliated with the plaintiff's enterprises. After the meeting, Block expressed his displeasure and annoyance with the defendant "for lying to the people" whereupon the defendant told him that he would see to it that the lots in question would be bought and sold in his own name.
The plaintiff testified that when he was told by the defendant that his investigation of the Coventry zoning regulations as they applied to the Nevers property disclosed that there was a potential for one hundred building lots in the area of the lake, the defendant was very enthusiastic and strongly recommended that as many parcels as possible should be purchased, and also told him that he wanted to undertake it as his own project from start to finish. Although the plaintiff was more conservative in his approach and cautioned against buying up property that they might not be able to subsequently resell or to develop, the defendant told him that he wanted to go ahead and pursue the project aggressively, because, in his words, "every little bit helps."
Both the plaintiff and his wife testified that the acquisition of the three additional lake lots that closed on August 14, 1991, was part of an "ongoing process" that began with the purchase and resale of the Nevers property and which was to be handled in the same way by utilizing the services of the defendant in obtaining the necessary zoning approvals, as well as the services of other employees and outside professionals who were ordinarily assigned to such duties or customarily retained to perform such services. In the course of the plaintiff's testimony he attributed his lack of involvement in the preliminary negotiations with Block to the fact that he had a "personality conflict" with him because of a prior business transaction, and explained that the defendant signed the purchase and sales agreements in his own name because the defendant CT Page 2932 had told him that he had put the contracts together himself because all the property owners "had a distaste" for the plaintiff and distrusted him.
The plaintiff testified that prior to the August 14th closing there were never any conversations or understandings between the parties that the three lots or any other lake lots would be acquired independently and on his own account by the defendant for his personal financial benefit byway of resale to Michael Block or to anyone else. The defendant's testimony was that he told the plaintiff in May that he would be pursuing the acquisition of the lots on his own, and that although he continued to keep the plaintiff informed, the plaintiff showed no real personal interest in the progress of the project until immediately after he learned that the defendant's application had been approved more easily than they had expected it would be at the zoning hearing held on the lots which he attended at the defendant's request on July 16, 1991.
Christine Sammartino, president of Tiger-Lee Construction Co., testified that the corporate bookkeeper was to set up the books for the Coventry lake lots, that in accordance with her repeated requests, the contracts for the three lots were given to her in July by the defendant, and that at the end of June or in early July Mrs. Sammartino did a fiscal analysis of the transactions showing the breakdown of acquisition costs (exclusive of engineering services) and the projected sales prices based on the information as to costs which had been given to her by the defendant. That document, which' was entitled "closing proceeds" (Plaintiffs' Exhibit E) showed the total proceeds from Block to be $90,000.00, total acquisition costs of $40,519.00, and disbursements of $15,000.00 to "WAT" (the defendant) and a balance of $49,481.00 to "Sammartino."
Mrs. Sammartino testified that the proposed disbursement of $15,000 to the defendant was based on previous conversations with him in which he had told her that he needed that amount because the bank was foreclosing on his home. She acknowledged on cross-examination that none of the costs incurred on the three lots were paid by the plaintiffs and she also stated that during that period they were finding it difficult to meet their expenses including an outstanding bill of $22,000.00 for engineering services which was unrelated, however, to the development and sale of the Coventry lots.
She also testified that on the day after the closing the CT Page 2933 defendant presented his own breakdown (Plaintiff's Exhibit F) which showed substantially higher costs that were not documented, a deduction of some $14,000.00 for estimated federal tax liability which he had previously expressed concern about to her and the plaintiff, and that he also tendered a check to her based on his computation which she refused "because it was not what she thought it should be." The defendant's breakdown also included the $15,000.00 disbursement which was reduced by what he estimated to be the tax liability on that amount.
The defendant's explanation for his concern about his personal tax liability was that the plaintiff had told him about a month before the closing that he would be exposed to such liability if he took title to the lots in his name. He testified that the plaintiff suggested that title to the lots be put in the name of a corporation which he had never heard of, but which he assumed was a Sammartino-controlled entity.
The closing of the three lots was held at the plaintiff's office on August 14, 1991, but he did not attend because he was taken ill that afternoon. Diane McCall, the secretary for the real estate agency, testified that she was told by Christine Sammartino that the closing would be held that day and that she should pick up the check for the closing proceeds from the closing attorney who was representing all of the parties to the transactions.
She stated that she had several telephone conversations with the defendant that day and the following morning in which he advised her not to wait for him to bring the check that day but assured her that he would "hold the check" that he had received from the attorney at the closing. The defendant acknowledged in the course of his testimony that he told McCall that she did not have to worry about the check but denied saying that he would bring the check over later.
According to the plaintiff, his first contact with the defendant after the closing was when he went to his house to ask about the check and that the defendant started to cry after he stated that the check was in the house and that the plaintiff did not trust him. The plaintiff also testified that on the following day the defendant told the Sammartinos that he had deposited the checks the day before and as soon as they cleared he would write the checks for the net proceeds from the closings.
Christine Sammartino described the defendant as "vacillating" CT Page 2934 during the week following the closings because he did not agree with her breakdown of the distribution of the proceeds of the sales of the lots. He also continued to be concerned about the tax consequences even though she assured him that there would be no personal tax liability on his part.
In the course of the last meeting of the parties on August 21, 1991 in the plaintiff's office, the plaintiff testified that the defendant said that he was "near the breaking point" because of all the pressures of the business and asked him to fire all of the employees. At the end of their four hour meeting the defendant told him that he would be back later that afternoon with the check but he did not come back.
The following day he said he was sorry that he did not bring the check because he had "a few things to clear up" and that it might be better if he quit. The plaintiff then told him that he could not continue to employ him if he continued to refuse to turn over the checks, at which point the meeting ended when the defendant became agitated and emotionally upset.
The defendant testified that as of August 14th, in addition to the lots sold to Michael Block on that date, there were other applications pending for building lot approval that had previously been submitted by the defendant. It was stipulated that the net profits from the sales of the remaining lots, which were the only ones approved and sold after August 14th, were $8,333.30.
The defendant's wife, Kimberly Tabor, testified that in June, July and August of 1991, she typed up three or four abutter lists and sent out certified notices in connection with the zoning applications for approval of lake lots in Coventry. She also stated that her husband worked many hours on the processing of the lots at home, that it was "very different" from what he usually did, and that although she did not know the details of what he was doing, she knew that he had "a deep personal interest" in the project.
The defendant also offered evidence in support of his claims that monies were due him from the plaintiffs, as alleged byway of a set-off as well as in a counterclaim, in the total amount of $20,659.48 for loans allegedly made by the defendant to the plaintiffs, as well as claims for reimbursement for such items as gasoline, uniform cleaning and the "salary override" of $165 which was not paid after January of 1991 as well as payment for 12 weeks CT Page 2935 of "unused vacation" at the rate of $650.00 per week. The plaintiffs deny that any such sums are due the defendant and that the documents and other evidence offered in support of those claims are insufficient to establish the plaintiffs' liability for them.
"The fundamental distinction between an employee and an independent contractor depends on the existence or nonexistence of the right to control the means and methods of work." Beaverdale Memorial Park, Inc. v. Danaher, 127 Conn. 175, 179. Where the existence of an employment relationship is a critical issue, the question that must be determined is whether the party who is claimed to be the employer has the right of general control without regard to whether that right is actually exercised under the particular circumstances. Daw's Critical Care Registry, Inc. v. Department of Labor, 42 Conn. Sup. 376, 391.
Although control or the right to control the activities of the person involved is important and is often deteriorative, "the control or right to control needed to establish the relation of master and servant may be very attenuated." 1 Restatement (Second), Contracts 220, comment (d) on Subsection (1). In some situations involving persons who are generally considered to be employees, "there may even be an understanding that the employer shall not exercise control." Id.
The specific duties which the plaintiff performed with respect to the Nevers lot and the three lots which were later sold to Michael Block on August 14th, were to obtain the required building and zoning permits, which, as has already been noted, was an essential and customary aspect of the defendant's managerial responsibilities which he generally performed with little or no direction from the plaintiff. It is also significant that Michael Block, who admittedly was biased against the plaintiff, testified that as far as he was concerned the defendant, throughout the negotiations preceding both transactions, was acting as the agent and employee of the plaintiff, even though Block knew that the purchase agreements as well as the deeds would be in the defendant's name.
Block's testimony that the defendant told him he was about to lose his home and that the plaintiff was going to give him a part of the proceeds of the sales of the three parcels to Block also tends to support the plaintiff's claim that the defendant was acting at all times as an employee under his general control. It is also consistent with Christine Sammartino's testimony about the CT Page 2936 purpose of the $15,000 disbursement that was to have been made to the defendant from the sales proceeds.
The defendant's evidence offered in support of his claim that the plaintiff had given his approval, express or implied, for him to work on all of the lake lots on his own time, at his own expense, and for his own personal financial benefit was based principally, if not exclusively, on his own testimony. Although his wife also testified about the time and effort that she spent on the project, that she did not know exactly what it was about, except for the fact that it was "very different" from the work that he usually did, and that he had "a deep personal interest" in what he was doing, he apparently chose not to tell her at that time that the work they were both doing was not being done for his employer as part of his job but was being pursued on his own as he later testified at the trial.
Where the defendant offers only his own testimony on a critical issue in the case, and the nature of the evidence so offered is such that it could easily be corroborated by a member of the family "who was specially situated to know the facts," it may be assumed that such person, if called, would be able to do so. See Baker v. Paradiso, 117 Conn. 539, 546. Accordingly, a negative inference can be drawn from his apparent failure to disclose to his wife that the work he was doing was being done independently and entirely outside of his employment, and that the profit to be derived from the sales of the lots would accrue to them rather than to the plaintiff.
An agent who has been authorized to purchase for his employer but instead purchases for himself becomes a trustee for his employer. Church v. Sterling, 16 Conn. 388, 400. Any profits that he derives as the result of the solicitation of valuable contracts for himself during the course of his employment in violation of the duty that he owed to solicit those contracts for his employer must be accounted for and paid over to his employer. Community Counselling Service, Inc. v. Reilly, 317 F.2d 241, 244 (4th Cir. 1963).
For the foregoing reasons the court finds that, as to the first count, the plaintiffs have sustained their burden of proof that the defendant was acting at all times as an employee of the plaintiffs and that he has refused to turn over to them the profits from the closings held on August 14, 1991, and from the sale of the two lots closed after that date as the result of his activities CT Page 2937 prior to the termination of his employment on or about August 22, 1991.
"Unless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profits to the principal." 2 Restatement (Second), Contracts 388. Plaintiffs' Exhibit E, which was prepared in June or July of 1991, according to Mrs. Sammartino, consists of information furnished by the defendant as to his costs exclusive of engineering services, and shows a balance due the plaintiffs of $49,481.00 after deducting the agreed disbursement of $15,000 to the defendant.
Although the defendant's breakdown as shown on Plaintiffs' Exhibit F shows higher total costs, he furnished no documentation to Mrs. Sammartino for those expenses when they went over them on August 15, 1991, the day after the closings. It is the duty of an agent "to keep and render to his principal an account of money or other things which he has received or paid out on behalf of the principal." 2 Restatement (Second), Contracts 382.
Accordingly the court concludes that the profit from the closings held on August 14, 1991 was $49,481.00 and the profit from the two lots closed after that date was $8,330.30 for a total amount due the plaintiffs of $57,814.30.
The court further finds that the plaintiffs have failed to prove the essential elements of fraud by clear, precise and unequivocal evidence under the second count; Creelman v. Rogowski,152 Conn. 382; and have also failed to establish that the defendant was liable for breach of a fiduciary duty owed to the plaintiffs as alleged in the third count.
The proof offered by the defendant to support his claims of set-off for amounts "loaned" to the plaintiffs was either not documented or explained sufficiently to establish them as valid subsisting debts presently due the defendant. The claims for reimbursement for gasoline expense and uniform cleaning were entirely undocumented and were based only on the defendant's self-serving and unsubstantiated testimony.
The defendant's claim for 31 weeks of "salary override" at $165 per week for 1991 cannot be sustained because the evidence establishes that the additional payment was for the purpose of expense reimbursement rather than byway of salary and was treated CT Page 2938 as such for income tax purposes. The claim for "unused vacation time" must also be rejected because there was no proof that any specific agreement or policy existed with respect to earned vacation time.
For the foregoing reasons, the court finds the issues in favor' of the plaintiffs against the defendant on the first count of the complaint and judgment may enter for the plaintiffs in the sum of $57,814.30. The issues are found in favor of the defendant against the plaintiffs on the second and third counts and the issues on the defendant's set-off and counterclaim are found in favor of the plaintiffs.
Hammer, J.