200 A.2d 428 (1964)
E. I. duPONT de NEMOURS AND COMPANY, a Delaware corporation, Plaintiff,
v.
AMERICAN POTASH & CHEMICAL CORPORATION, a Delaware corporation, and Donald E. Hirsch, Defendants.
Court of Chancery of Delaware, New Castle.
May 5, 1964.
*429 James M. Tunnell, Jr., William S. Megonigal, Jr., and Richard L. Sutton, of Morris, Nichols, Arsht & Tunnell and Walter D. Ford, Wilmington, for plaintiff.
David F. Anderson and Richard L. McMahon, of Berl, Potter & Anderson, Wilmington, for defendants.
SEITZ, Chancellor:
This is the decision on defendants' motion for summary judgment in plaintiff's action to enjoin the use or disclosure of plaintiff's trade secrets.
Plaintiff, E. I. duPont de Nemours and Company, a Delaware corporation, brought this action against American Potash and Chemical Corporation ("Potash"), also a Delaware corporation, and Donald E. Hirsch ("Hirsch"), a former employee of the plaintiff who is currently employed by Potash. Plaintiff sought, and the court granted, a restraining order which, inter alia, prohibited Hirsch from divulging or disclosing the plaintiff's trade secrets and confidential information relating to the manufacture of titanium dioxide (TiO2) pigments by its chloride process. The order also restrained Hirsch, despite the absence of a covenant not to compete, from accepting or undertaking any employment by Potash or engaging in any work with Potash in connection with or related to the operation and development of a chloride *430 process or in connection with or related to the manufacture of TiO2 pigments by a chloride process. An appropriate restraint was also imposed upon defendant Potash. Later, after argument, the court ruled that a preliminary injunction in the same terms as the restraining order should issue. However, no such order was ever presented for signature. Concededly, however, the restraining order is still in effect. Plaintiff also seeks a permanent injunction of the same scope as the restraining order.
After the decision on the preliminary injunction argument was announced, certain depositions were taken and interrogatories filed and answered. Thereafter, the defendants filed a motion for summary judgment in effect to dismiss the case before trial for lack of legal merit. The decision on this motion requires a rather elaborate factual presentation.
Plaintiff is engaged in developing, manufacturing and marketing a large variety of chemical products. At two of its substantial manufacturing plants plaintiff is, and for many years has been, engaged in the commercial manufacture of TiO2 pigments by a chloride process. On this record it may be said still to be the only successful commercial manufacturer of the product by a chloride process, at least in this country. Plaintiff is now constructing at Antioch, California a new commercial plant which will be used exclusively for the manufacture of such pigments by its chloride process.
The defendant Hirsch was employed by plaintiff on August 21, 1950. He had previously been a college instructor with a bachelor's and a master's degree in chemical engineering. In 1954 he received a doctorate. When he joined plaintiff, he executed an agreement by which he agreed, inter alia, not to use or disclose any of plaintiff's trade secrets without its prior written consent. As noted above, the agreement contained no restriction against his employment by a competitor of the plaintiff in any field.
When Hirsch joined the plaintiff in 1950, it was undergoing at its Edge Moor, Delaware plant the trials and tribulations of attempting to manufacture TiO2 pigments by a chloride process for commercial use. Hirsch became a part of the personnel working to accomplish that objective. The successful development of the process was admittedly a long, involved, and expensive corporate effort.
From 1950 to 1955 and from 1960 to 1961, Hirsch was engaged principally in the research and development of plaintiff's chloride process. In the interim he worked in plaintiff's niobium manufacture. From the latter part of 1961, and until he resigned on November 27, 1962 to go with Potash, he was a very important member of a group assigned to advise in the design of plaintiff's new Antioch plant.
It would appear that though the defendant Hirsch had advanced in his particular line of endeavor, he desired to become involved in some management aspect of this work rather than the purely technical side and made this known to his superiors. As time went by, he apparently became unhappy, not so much with the compensation as with the fact that he had not been transferred to some managerial aspect of the operation. Commencing in or about 1959, he made inquiries about job opportunities elsewhere, but nothing developed until Potash entered the picture.
Potash is a diversified manufacturer of industrial chemicals. In November 1960, arrangements were completed between Potash and Laporte Industries, Ltd., of Great Britain for Potash to manufacture titanium dioxide in the United States by the sulphate process, Laporte being a large manufacturer of TiO2 by that process in England. By the spring of 1961, however, Potash had concluded that the competitive position of its TiO2 venture in the United States would be enhanced through use of a chloride process in lieu of the sulphate process originally envisaged. The chloride process is said to have a number of distinct commercial advantages over the sulphate process.
*431 On March 20, 1961, Potash requested from plaintiff a license granting it the right to use plaintiff's patents and know-how relating to the manufacture of TiO2 by its chloride process. Though plaintiff offered Potash a license under certain of its patents dealing with the chloride process, it refused to grant Potash any right with respect to its secret know-how relating to such process. Potash dropped that approach.
In August of 1962, defendant Potash began recruiting personnel for a plant it was then designing and intended to construct in California for the manufacture of TiO2. Production therein would be by a chloride process which defendants say was developed over a ten-year period by Laporte Industries, Ltd., through an extensive research and pilot plant program. At this stage, however, it appears that Laporte still does not produce TiO2 in commercial quantities by its chloride process. Nevertheless, Potash's engineers and chemists have participated in Laporte's work since 1960, and Potash alleges that it is now entirely capable with the help of Laporte of designing, constructing, and operating, presumably successfully, a large commercial plant for the manufacture of TiO2 by a chloride process in the United States.
In mid-September 1962, Potash first advertised in a Wilmington, Delaware paper, where plaintiff's home offices and its Edge Moor plant are located, for applicants for the position which Hirsch ultimately accepted, viz., manager of plant technical services. Later, to aid it in its program of recruiting personnel, Potash engaged a management consultant firm. That firm advertised in a Chemical Engineers' bulletin for a "Manager, Plant Technical Services". Defendant Hirsch answered this advertisement. A personal interview followed, and on November 28, 1962  one day after he had resigned from plaintiff  an employment agreement was signed with Potash, in which Hirsch agreed, inter alia, that he would not disclose "any information that he knows to be proprietary or confidential information, data, development or trade secret of a third party without the prior written consent of said third party". Although the position Hirsch was to fill presumably was to come into active being only after Potash's plant was completed, it is not suggested that he would not have become involved in the project before that time in the absence of this court's injunction.
Hirsch accepted his new position with knowledge that plaintiff intended to try to block him from working for Potash in connection with the production of TiO2 pigments by a chloride process because of its expressed belief that such employment would result in a use or disclosure of plaintiff's secrets contrary to Hirsch's obligation to plaintiff. He was also advised that his job with plaintiff was still available to him.
Immediately thereafter plaintiff commenced this action to enjoin the defendants from using or disclosing its trade secrets. Subsequently defendants filed their motion for summary judgment which evokes this opinion. Parenthetically Hirsch is working for Potash in another product area but not in any specific capacity as yet.
The parties agree that the law is well settled that where an employee has agreed either expressly or by implication as one of the terms of his contract of employment that he will not divulge or disclose to his employer's detriment any trade secrets or other confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information by its former employee for his own benefit or for the benefit of a third person.
In determining the application of this rule of law to the present case, the court at this stage must take the following facts to be established: (1) Plaintiff has patents as well as numerous valuable trade secrets which it has developed in connection with its research and development of a chloride process for the production of TiO2 pigments; *432 (2) Plaintiff has been successfully manufacturing TiO2 pigments by a chloride process for commercial purposes for many years but only after engaging in extensive and continuous research and experimentation extending over many years at a great cost to the plaintiff; (3) Plaintiff is currently the only successful commercial manufacturer of TiO2 by a chloride process, certainly in the United States and perhaps generally; (4) Plaintiff has taken the requisite action to protect and preserve the integrity of its secrets and confidential information in connection with the manufacture of this product; (5) Hirsch has knowledge of such trade secrets which he obtained in the course of his employment with plaintiff; (6) The disclosure of these secrets would be of value to Potash in connection with its new venture; (7) The disclosure of these secrets will damage plaintiff in a way that would not be adequately compensable in damages.
While the defendants concede for purposes of this motion that plaintiff has rights in its trade secrets which the court might protect in an appropriate case, they contend that under recognized equity principles plaintiff must show that the injury alleged is imminently threatened and not merely possible before an injunction may issue. Courts, they say, may only deal with a present controversy and may not act to allay an employer's mere apprehension of injury or his unconfirmed fears. They emphasize that plaintiff admits that it has no knowledge that Hirsch has used or revealed its confidential information, and they contend that there is no evidence that he intends to do so. Thus, the defendants take the position that the undisputed facts of record are insufficient to raise an inference at this stage that after final hearing the plaintiff will be able to prove a real and substantial threat of unlawful use or disclosure of its trade secrets by the defendants.
Plaintiff concedes that it must show at final hearing an imminence of harm in order to obtain appropriate injunctive relief. Plaintiff, as I understand its case, takes the basic position that proof of an inevitability of disclosure arising from Hirsch's employment by Potash, without more, will warrant the granting of the injunctive relief sought in this action, the threat of unlawful disclosure being implicit in the situation itself. The legal question involved in this proposition is, in my opinion, as complex as it is provocative, but it need not be resolved now. I say this because as I analyze the record in conjunction with the statements of counsel at the oral argument, plaintiff also claims that defendants' present motion must be denied since the record does not foreclose the possibility of a determination after final hearing that the facts justify a finding of an imminent threat of a violation of Hirsch's fiduciary duty to the plaintiff. Plaintiff's alternative position is thus premised upon the well-recognized legal principle that equity will enjoin a threatened breach of fiduciary duty.
Since the case is before me on defendants' motion for summary judgment, defendants have the burden of demonstrating that there is no dispute as to any possible issue of fact material to any valid legal theory advanced by plaintiff in support of its case. Defendants claim, and plaintiff denies, that on the present record they have met this burden. The parties impliedly part company when they come to decide the factual material relevant here to a finding of a threatened breach of fiduciary duty. Defendants seem to suggest that in order for plaintiff to survive the present motion there must be "evidence" in the record of a type which would be directly relevant to the issue of a wrongful intent to disclose. While they admit that the circumstances surrounding Hirsch's employment by Potash are calculated to give rise to a suspicion or apprehension that disclosure of plaintiff's secrets will follow, they say that such a suspicion is not sufficient to justify the granting of relief. They go on to claim that the record contains no facts which under any valid legal theory will justify a finding of a threatened *433 abuse of the confidential relationship between Hirsch and plaintiff. In particular, the defendants urge that there is no basis in the record from which the court might later conclude that the defendants were guilty of bad faith or that a high degree of probability of disclosure, which plaintiff says amounts in this case to an "inevitability", exists.
In opposition to the motion plaintiff urges that certain facts, when placed against the factual background of this case, prevent the court from now inferring that no possible finding of a threat of wrongful disclosure could be made after trial. Plaintiff points out that any chloride process for manufacturing TiO2 pigments in commercial quantities includes three basic steps  chlorination, oxidation, and treating  and that all of the above steps must be practiced by anyone attempting such manufacture. Potash must follow these steps in its planned operation. In obtaining the integration and coordination of the several stages involved in its commercial manufacture, it appears to be established that essential know-how is required to assure commercial production of a quality grade product.
On this record it can be said that an inherent characteristic of the chloride process is that serious, costly and difficult problems are experienced for the first time when attempts are made to scale up the operation from laboratory, semi-works or pilot plant scale to a commercial operation. These difficulties ensue from the nature of the technology involved, the relatively high temperatures and corrosive chemicals which must be used, and the reaction products formed. As a result, clostly stop-pages, equipment failures and breakdowns occur.
Hirsch presumably is fully acquainted with plaintiff's chloride pigment treating techniques and the necessity of their observance in order to duplicate plaintiff's pigment quality. On this record this is highly valuable know-how. Assuming that Potash does not now have this know-how, one can infer that knowledge or use of it by Potash would substantially reduce, or avoid altogether, the time lapse and attendant costs which exposure tests necessarily entail. Indeed, Hirsch testified that he knew as much about plaintiff's TiO2 chloride process as anyone now employed by plaintiff except one individual.
Plaintiff also points out that in September 1962, the defendant Hirsch was a senior research engineer for plaintiff and a key member of its task force assigned to the design and construction of the new Antioch plant for the production of TiO2 pigments by its chloride process. It was the responsibility of the Antioch task force to conduct various plant tests, prepare basic data and provide detailed assistance in the design and start-up of the new plant. Furthermore, it was the responsibility of the task force to undertake necessary engineering development work at the site and to incorporate into the Antioch operation all of plaintiff's latest chloride process technology.
Against this background and Hirsch's exposures thereto it is pertinent I think to consider portions of Potash's description of the position which Hirsch is to fill:
"BASIC FUNCTION

"Supervise and direct the activities of Plant Technical Services, to attain the highest possible process efficiency. Improve existing methods of operation for increased efficiency.
"DUTIES & FUNCTIONS

"1. Supervise and initiate studies on process efficiency and cost reduction.
"2. Ensure the application of sound scientific principles in laboratory and pilot plant scale development studies.
"3. Carry out process engineering design for purchase and installation of new or altered equipment.
"4. Responsible for start up of new or improved processes including operating instructions, manuals, and safe work procedures.

*434 "5. Read and appraise reports and literature pertaining to processes and equipment which may be adaptable to plant operations.
"6. Submit recommendations with appropriate justification for approvals required and for action by appropriate supervision.
"7. Prepare reports of investigations, test conditions, procedures, economic advantages and disadvantages, results, conclusions and recommendations.
"8. Submit regular and periodic reports as may be required.
"RESPONSIBILITY & AUTHORITY

"Men

"Has direct supervision of two senior process engineers and two process engineers. Responsible for proper job and safety training for plant personnel on new processes and equipment.
"Operations & Functions

"Expected to organize and supervise work in a professional and independent manner. Observes plant operations and initiates investigations and test projects. Accountable for completeness and technical accuracy of work and for the logic and validity of conclusions, reports and recommendations rendered.
"Equipment

"Thorough understanding of and proper utilization of valuable plant equipment. Make recommendations pertaining to the purchase of new equipment and changes in existing equipment.
* * * * * *
"JOB REQUIREMENTS

"* * * Knowledge  Must have knowledge and experience in TiO2 production and process. Management experience necessary.[1] Ability to analyze, interpret and record technical data and to discern its practical value."
Parenthetically, before turning to a consideration of how Hirsch visualizes his functioning in his new position in the light of his duty to plaintiff, I must mention the fact that the court is somewhat handicapped at this stage by lack of explicit descriptions of the various trade secrets which, at least for present purposes, plaintiff admittedly possesses.[2] Defendants argue that plaintiff's answer to interrogatory 25 indicates that plaintiff cannot identify its trade secrets. This, I think is a misinterpretation of plaintiff's answer. Plaintiff's answer says that it "* * * does not possess any writing which sets out and defines its trade secrets for the production of titanium dioxide pigments in a manner distinct from matters which are not trade secrets". The answer goes on to say generally where the information appears in its records. The short answer to defendants at this stage is that they have conceded at least for present purposes that plaintiff has valuable trade secrets. Indeed, it is reasonable to infer from this record that such secrets exist in many steps of the manufacturing process and with regard to both the chemical and engineering aspects thereof.
The court does not have a description of the so-called Laporte process which Potash will presumably employ. Thus, the court does not know how it differs, if at all, from the plaintiff's process. Nevertheless in view of the subject matter and the history of its development, I think it reasonable at this stage to infer that at least some of plaintiff's trade secrets exist in areas where Hirsch will be called upon to exercise his chemical engineering leadership for Potash.
Hirsch conceded that there might be situations where there would be a "conflict" *435 between his job assignment and his duty to plaintiff. Indeed, he discussed the "ethics" of the problem with some of plaintiff's employees before leaving. Presumably he was talking about situations where he would be conscious of a disclosure problem. However, his very discussion of his procedure for resolving such situations when they arise fails, at least at this stage, to negative completely the possibility that there is a threat of disclosure implicit in the circumstances. For example, he testified as follows on deposition:
"Q Now then, in view of your recognition that ethical problems were involved on the engineering level, how would this affect your choice?
"A My standard mode of operation in making such decisions is and has been to examine the  on paper  the economics, the economic effects, the dollar effect on the plant of any alternative choices that I have been presented or that I have personally developed. I can and will ask these engineers to make these evaluations whether it be in a sensitive area [trade-secret area] or not.
"Q If it were in a sensitive area could you give it the supervision that a supervisor should?
"A I feel that I could in making sure that his economic evaluation follows good engineering practice."
As I read this quoted testimony, Hirsch is saying that in situations where he recognizes that a possibly pertinent trade secret of plaintiff is involved, he will confine himself to the use of unrestricted material. I think it is evident even to one unsophisticated in chemical and engineering matters that at least at this stage it is impossible to say that all of plaintiff's trade secrets in those areas are susceptible of consciously being so isolated by Hirsch. One cannot now say that there is no issue as to his ability to avoid drawing on them when he comes to give instructions or suggestions relative to the solution of problems arising in Potash's commercial chloride process operation. Moreover, Hirsch's deposition testimony as to his proposed procedure for determining whether or not plaintiff's trade secrets are involved,[3] certainly does not, at least at this stage, negative the possibility of a finding of a reasonable probability of disclosure, particularly in the context of his divided loyalty situation.
Plaintiff also points to other factors which it says are relevant in determining whether a threat of wrongful disclosure exists. Some of these are plaintiff's refusal to grant Potash any rights with respect to its know-how in connection with the chloride process and Potash's subsequent attempt to hire employees in the Wilmington area where plaintiff's Edge Moor plant is located; Potash's efforts to obtain from Thermal Research & Engineering Corporation a Vortex burner which plaintiff says was engineered from secret research by plaintiff and is the subject of a "Security Agreement" barring disclosure by Thermal of any details of alterations in or operations of the burner; and Potash's admitted desire in hiring Hirsch to obtain someone with "chloride experience, ideally".
As I understand the matter, plaintiff takes the position that the degree of likelihood that Hirsch will disclose plaintiff's trade secrets constitutes a factual area which may be explored in determining whether a real threat exists that he will violate a confidence owed to the plaintiff. Plaintiff says that on this record an issue is created as to whether disclosure will inevitably or probably follow from Hirsch's employment by Potash and that this "fact" in combination with the other factors mentioned warrants a possible finding after *436 final hearing of a threat of unlawful disclosure sufficiently imminent to justify injunctive relief.
Defendants contend that to the extent that plaintiff's claim is premised on an alleged use or disclosure arising "inevitably" from Hirsch's discharge of his duties with Potash, that allegation is unsupported by the facts of record. They also say that the issue of "inevitability" in any case is not capable of present proof or disproof and amounts in substance to a "prophecy" which can only be proven after the event. Thus, they would remove this issue from the factors to be weighed by the court in determining whether the present record forecloses a finding that plaintiff may ultimately succeed in proving a substantial threat of unlawful disclosure.
I have no doubt but that the court is entitled to consider, in judging whether an abuse of confidence is involved, the degree to which disclosure of plaintiff's trade secrets is likely to result from the circumstances surrounding Hirsch's employment by Potash. The defendants say that a finding of "inevitability" would be no more than a "prophecy" here. Nonetheless, in the context of determining whether a threat of disclosure exists, it is but a finding as to the probable future consequences of a course of voluntary action undertaken by the defendants. Courts are frequently called upon to draw such conclusions based on a weighing of the probabilities, and while a conclusion that a certain result will probably follow may not ultimately be vindicated, courts are nonetheless entitled to decide or "predict" the likely consequences arising from a given set of facts and to grant legal remedies on that basis. I am satisfied that the degree of probability of disclosure, whether amounting to an inevitability or not, is a relevant factor to be considered in determining whether a "threat" of disclosure exists.
While the defendants appear to say that individually and collectively the "facts" narrated by the plaintiff rise no higher than a mere supposition that plaintiff's secrets will be used or disclosed, I am satisfied that defendants at this stage have not met their burden of foreclosing the possibility of a finding after trial of a real and substantial threat of unlawful use or disclosure. It may be, as defendants say, that mere suspicion in combination with opportunity is an insufficient factual basis for granting prospective relief. However, where there is a finding that a threat of use or disclosure exists which the court concludes will, if effectuated, constitute a breach of confidence, the court will grant appropriate relief.[4] Compare B. F. Goodrich Co. v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99.
As I see it, the only difference between cases like Wohlgemuth and the situation here relates to the probable nature of the proof upon which the court will be asked to grant relief after final hearing. Certainly it is not unusual for a court to act on the basis of inferences drawn from circumstances rather than so-called direct proof. Otherwise stated, a court may conclude that the facts warrant a finding of a threat of wrongful use or disclosure absent any direct evidence as to the employee's intention such as existed in the Wohlgemuth case.
Finally defendants say that there is no issue of material fact in the record and the record presented could not justify the *437 granting of relief to plaintiff after trial. This contention suggests one of the difficulties involved in attempting to apply the summary judgment device to certain types of cases. Here, for example, plaintiff relies upon an alleged breach of fiduciary duty. This type of claim often requires a consideration and evaluation of many facts. The decision arises from an agglomeration of many facts and what are deemed to be the proper inferences drawn therefrom. Thus to adopt the procedure of isolating each fact and demonstrating that in and of itself it is innocent is not necessarily to negative the effect of a marshalling of such facts. That is the situation here at this stage. It requires the denial of defendants' motion.
Both defendants are represented by the same counsel and no suggestion was made in the briefing or argument that the ultimate findings might be different as between Hirsch and Potash. Thus, at this stage, I have not attempted to consider whether such a factor could ultimately be important.
The court fully recognizes that this is a case of great social and industrial significance both on the question of the right to relief and, if established, the scope thereof. Among the substantial and conflicting policies at play in this situation are the protection of employers' rights in their trade secrets on the one hand, versus the right of the individual to exploit his talents, use matters of general knowledge, and pursue his calling without undue hindrance from a prior employer on the other. The law recognizes that trade secrets are entitled to reasonable protection regardless of the supporting legal label. Reasonable legal protection tends to encourage, as here, substantial expenditures to find or improve ways and means of accomplishing commercial and industrial goals. The protection of such efforts when translated into trade secrets tends to encourage such efforts and the result is beneficial to the employer and presumably to society. However, it is hard to ask a man to work in a trade secret area and thereby circumscribe his possible future liberty of action and the use of the knowledge and skills which are inextricably interwoven with his knowledge of the trade secrets.
The "interests" involved are as easy to state as they are difficult to protect, particularly in the face of the ever-increasing complexity of present day technology. What accommodation, if any, is to be made must await the decision after trial.
Present order on notice.
NOTES
[1] Presumably waived as to Hirsch.
[2] Defendants did not press for a description of them before bringing on its present motion.
[3] Hirsch testified "* * * if we are in one of these areas of conflict [Potash problem area where plaintiff's secrets may be involved] I can point out a textbook or a literature reference to the solution that I can see this is the source of it, I have no problem; if I can't do that I've got to forget it, ignore it."
[4] Plaintiff seeks herein, inter alia, injunctive relief barring Hirsch from engaging in any work with Potash in connection with or related to the operation and development of a chloride process or in connection with or related to the manufacture of TiO2 pigments by a chloride process. The restraining order now in effect grants this relief. While defendants challenge the propriety of the court's granting injunctive relief in this form after final hearing in the absence of a restrictive covenant between plaintiff and Hirsch, I do not reach this difficult and significant issue at this time. Whether such relief was properly included in the restraining order is not before me now.