## OPERATIONS RESEARCH, INC. *v.* DAVIDSON & TALBIRD, INC., ET AL.

[No. 234, September Term, 1965.]

*Decided March 4, 1966.*

*Motion for rehearing filed March 31, 1966, denied April 12, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, OPPENHEIMER and McWILLIAMS, JJ.

*H. Hughes Spragins* and *Robert F. Fuchs,* with whom were *Everngam, Tomes & Spragins* and *Schapiro & Fuchs* on the brief, for appellant.

*James J. Bierbower* for appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

This case involves another balancing of the duties of loyalty owed by employees to their employers and the rights of individuals to use their skills for their own benefit. The appellant, Operations Research, Inc. (ORI) filed a bill in the Circuit Court for Montgomery County to restrain former employees and the two corporations which they had organized from taking advantage of alleged breaches of trust and fidelity while they were in ORI's employ. ORI also asked for consequential damages. After 17 days of testimony, reflected in over 1000 printed pages of record extract and appellees' appendix filed with this Court, Judge Pugh filed an opinion and decree dismissing the bill of complaint. This appeal ensued.

ORI was organized in 1954 by two men, one of whom was Dr. Emory Cook, its president and majority stockholder. Cook is a graduate of Illinois University and a former member of the staff of the Applied Physics Laboratory of Johns Hopkins University. Since its incorporation, ORI has been engaged in performing operations research services for governmental agencies and private industry. Dr. Harold O. Davidson (Davidson), one of the appellees, is a professional engineer with degrees from the Georgia Institute of Technology and The Ohio State University. He taught at both institutions and from 1948 to 1953 was a consultant to the United States Air Force, Air Traffic Control. From 1953 to 1958 he was a scientist at the Operations Research Office of Johns Hopkins University, working almost entirely on problems for the Army. In 1958, he returned to Georgia Institute as a professor in charge of graduate programs in industrial engineering. He was employed by ORI in 1959, became its vice-president, was elected to the board of directors in 1962, and by 1964, was receiving an annual salary of $30,000 with fringe benefits. The appellee, Joseph A. Talbird (Talbird) joined ORI in 1959 and became a program director. In 1964, his salary was $18,000. The other individual appellees were all employees of ORI in 1964, with substantial salaries. The two corporate appellees were formed shortly after the individual appellees had resigned from ORI.

Davidson resigned as a member of ORI's board of directors in September 1964, in a letter expressing his dissatisfaction

with ORI's policies. On Friday, December 4, 1964, he resigned from the company. The next morning, December 5, Talbird resigned. Cook called a meeting of the employees of the division previously directed by Davidson, announced the resignations of Davidson and Talbird and made some critical remarks about the business abilities of both men. The afternoon of the same day, a number of employees who had attended the meeting called by Cook went to Davidson's home and were told that he and Talbird intended to form a new firm. A number of these men signed informal applications for employment with the new company. On December 7 and within a few days thereafter, the other individual appellees and other ORI employees who had worked with Davidson and Talbird resigned from ORI. None of the individual employees had any written or oral term agreements of employment with ORI; all of the employments were terminable at will, either by ORI or the employee, and there were no written restrictive covenants of any kind.

The corporate appellee, Davidson & Talbird, Inc., was incorporated under the laws of Maryland on December 7, 1964 with Davidson and Talbird as its principal officers, and with its office in Bethesda. Immediately after their resignations, Davidson and Talbird solicited business for the new company to be formed from the Coca-Cola Company and the Southern Railway System, which had been two of ORI's most important clients. For the fiscal year ending November 30, 1964, approximately one-quarter of ORI's net operating profit before taxes had come from these two companies. While with ORI, Talbird had worked closely with Southern Railway and Davidson had had a similar relationship with Coca-Cola. Davidson had been a part-time consultant with Coca-Cola before he was employed by ORI and testified he brought that company to ORI as a customer. The new company received substantial business from both Southern Railway and Coca-Cola. Davidson, through ORI, had been employed as a scientific adviser to the Advanced Tactics Project, Combat Developments Command of the United States Army; after his resignation from ORI, his services with the Army were continued under a contract with Duke University. Davidson and Talbird, before their resignations, had told the officials of Southern Railway, Coca-Cola and the Tac-

tics Project with whom they dealt that they were dissatisfied at ORI and might, or intended to, resign. Whether or not there was solicitation of business for the new enterprise before the resignations is one of the factual issues on which voluminous testimony was taken.

In addition to testimony in support of its contention that Davidson, Talbird and the other individual appellees solicited ORI's customers while in its employ, in violation of their fiduciary duties, ORI endeavored to prove that the appellees wrongfully recruited other key employees and, in their alleged conspiracy, used information of a confidential nature gained by them as ORI employees and diverted business opportunities from ORI to themselves. ORI also offered evidence to show that its method of doing business was a trade secret, which the appellees wrongfully used in their own behalf. The appellees denied all these allegations and produced testimony in corroboration of their denials.

In his opinion, after summarizing the respective contentions and the conflicting evidence, Judge Pugh concluded that there was no trade secret involved, that the appellees had not violated any trust or breached any duty of fidelity which they owed ORI and that there was no conspiracy between the appellees. These conclusions were based on findings of fact to which we shall refer in the discussion which follows. Our consideration of the facts is based on Maryland Rule 886 a, which provides that when an action has been tried by the lower court without a jury, the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given the opportunity of the lower court to judge the credibility of the witnesses. We also keep in mind the principle that if there is substantial evidence to support the court's factual conclusions, those findings must be reviewed in the light most favorable to the prevailing party below. *Space Aero Products Co. v. R. E. Darling Co.*, 238 Md. 93, 106, 208 A. 2d 74, *cert. denied* 382 U. S. 843 (1965) and cases therein cited.

### The Trade Secret Question

Whether there was a trade secret is a conclusion of law upon the applicable facts. *Space Aero, supra,* at 105-06, and authorities therein referred to.

In his opinion, Judge Pugh said, on this matter:

"The plaintiff's business is operations research. This is generally defined as analyzing operations of governmental as well as commercial problems. It is concerned with the design, improvement and installation of integrated systems of men, materials and equipment or an analysis of operations and systems and a prediction of systems performance and reliability. As a practical definition, it is a group of highly skilled engineers and scientists gathered together under a corporation or partnership, who analyze a business, be it the government or a commercial business, in order to devise methods to improve its operation with efficiency and at the least cost."

Cook, in claiming that Davidson and Talbird took ORI's trade secrets, testified that the secrets consisted of "the grand design" for work to be done for the various companies, that the design is on paper, "in pieces and snatches," that to duplicate work theretofore done by ORI, a competitor "would have to get this designing into his own mind so he could begin to implement." In the construction of the design, he said, "all the sciences that are applicable are used." "We do jobs, and by jobs most of us mean we construct a system that meets a stated need." "It is kind of like—well, if you have designed a chair that is particularly pretty and particularly comfortable, that design, where it is not secret it is certainly a product of the creative effort, and there are some proprietary rights."

However, Dr. George E. Kimball, vice-president of Arthur D. Little, Inc., another company engaged in operations research, who testified on behalf of ORI, in answer to a question of the court, said that the methods used to make the determinations are not usually referred to as trade secrets. He testified that mathematical models, which involve equations and other mathematical techniques, are the heart of the work. "Generally speaking, an operations research study involves a rather complex system, and one has to do an analysis of how the entire system works. To make that analysis properly, it is necessary first of all to tear it apart and do its pieces, the fundamental units, and find out how each one of these works by itself; and then

558

as a second phase to study the interrelationships between those units to finally work up to the entire system." While his company tries to avoid public disclosure, even if a competitor had Little's unpublished data "* * * it might put him in a more favorable position than otherwise, though I don't believe it would be very favorable since it was our work he was trying to use."

Major General Lipscomb of the Army Combat Developments Command, a graduate of the Military Academy and the National War College with a master's degree in engineering from Cornell University, has dealt with a number of operations research firms. He testified that no trade secrets were involved in his engaging Davidson through ORI as scientific advisor.

In *Space Aero,* 238 Md. at 105-13, we considered the nature of a trade secret. Restatement, Torts § 757 comment *b* (1939) states that "[a] trade secret is a process or device for continuous use in the operation of the business. * * * [T]he subject matter of a trade secret must be secret." We agree with Judge Pugh that operations research, from the evidence, involves the coordinated approach of skilled engineers and scientists to a particular problem, rather than a process or device. In any event, in our opinion, ORI did not prove the essential element of secrecy. *Mycalex Corp. of America v. Pemco Corp.,* 64 F. Supp. 420 (D. C. Md. 1946) *aff'd.* 159 F. 2d 907 (4th Cir. 1947) and cases therein cited. See also Turner, *Trade Secrets* (London 1962) 24-31. We hold that there was no trade secret.

### Solicitation of ORI Customers

This Court has consistently held that during the term of employment, an employee's duty of fidelity and trust bars him from soliciting his employer's customers, although he may advise the customers with whom he has been in contact of the proposed termination of his employment. *C-E-I-R, Inc. v. Computer Dynamics Corp.,* 229 Md. 357, 366, 183 A. 2d 374 (1962) ; *Ritterpusch v. Lithographic Plate Service, Inc.,* 208 Md. 592, 604-05, 119 A. 2d 392 (1956) and authorities therein cited. Whether there was such an improper solicitation in this case is a question of fact.

Judge Pugh found that ORI had not proved such solicitation as to any of the three organizations involved, the Combat Developments Command, Coca-Cola and Southern Railway. In making this factual finding, Judge Pugh stressed the denials of the appellees and the denials by representatives of two of the organizations. General Lipscomb testified that Davidson had made no solicitation prior to December 5, 1964. Fillmore E. Eisenberg, controller of the Coca-Cola Company, under whom Davidson worked while with ORI and before, stated in his deposition that when he first learned Davidson might resign from ORI, he, Eisenberg, made it clear he wanted no proposals from them "until such time as this whole problem was completely resolved," and Davidson did not tell him that he, Davidson, was setting up a new organization until after his resignation.

ORI contends that, while General Lipscomb denied any solicitation prior to December 5, 1964, the General also testified that before Davidson's resignation, "he advised me that he might be fired or he might resign, and he wanted to assure me that whatever happened that I could count on him to give me whatever support I required." This statement, however, is to be taken in the context of the military services involved. The General testified that Davidson had been employed through ORI when Dr. Rumbaugh, the chief scientific advisor to the Combat Developments Command, had suddenly died; and that "the most competent individual that I could find in the country for my needs was Dr. Davidson." Shortly after his resignation, Davidson entered into a consulting agreement with ORI to complete the work for the Government then in progress, and thereafter, continued to work for the Army though Duke University. Cook testified that he would have expected Davidson to have volunteered to complete his obligation with the United States Government. He said: "Dr. Davidson has no choice but to complete that obligation. It is a terribly important National Defense job; he is senior scientist in it. He is critical to the completion of that project. It would be an utter act of irresponsibility not to complete that contract." An expression of willingness to continue vital defense work for the nation is not an improper solicitation of business. See *Space Aero* at 128 and 130.

ORI's work for Coca-Cola, from 1962 through the end of its fiscal year in 1964, was on a year to year basis. Before the beginning of each year. Eisenberg decided what, if anything, he wanted done for the next year, ORI was working on proposals to Coca-Cola for the coming year when Davidson, Talbird and the other employees resigned.

In attacking the lower court's finding that none of the individual appellees solicited Coca-Cola while employees of ORI, the attorneys for the appellant, in their able and comprehensive brief, list 27 items of what they designate as "admitted or undisputed evidence," which, they submit, lead to a contrary conclusion and which, they suggest, the lower court did not consider in making its finding. It is true that, in his opinion, Judge Pugh did not attempt to set forth all the testimony adduced in the 17-day trial and the numerous exhibits which were offered. But that the Judge, in making his findings, was thoroughly familiar with all the evidence is demonstrated, if indeed demonstration were necessary, by the cogent questions he addressed to the witnesses on the vital issues. This Court has considered all the evidentiary matters to which ORI refers; to recapitulate and discuss them in detail would extend this opinion to an inordinate length. We shall confine our discussion to several of the matters which ORI stresses.

Early in November, 1964, Roger C. Eyler (the project leader in charge of the governmental work assigned to Davidson's division in ORI) approached the president of the Union National Bank in Westminster as to a proposed loan for a contemplated research and engineering firm. A few days later, Eyler submitted to the bank financial statements of Davidson, Talbird and himself, and told the president of the bank that the proposed corporation hoped to obtain work from Coca-Cola. He applied for a loan of $62,000, asking that $22,000 be granted immediately to the three individuals and that the remaining $40,000 be granted "around January." On November 10, 1964, the bank's board of directors approved a loan of $62,000 to the three men and their wives, "provided they get a Coca-Cola contract." J. Pearre Wantz, Jr., the president of the bank, called as a witness by the appellant, when asked what representations, if any, were made by any of the three individuals as to

what contracts would be available, answered, "They said possibly a Coca-Cola contract, * * * And if they couldn't get a Coca-Cola contract, it would be some other national corporation." The $22,000 was lent to the individuals, but the $40,000 loan was not consummated because no contract was assigned.

Stanley R. Parent, one of the appellees, testified that on December 2nd or 3rd, he had a conversation with Talbird, his supervisor on the Coca-Cola work, in which he, Parent, said "I'm pretty tired. I don't know how tired I am," and Talbird said "There are a lot of us getting tired." Talbird said there was the probability that he and Davidson were going to leave ORI and start a new corporation. Parent asked if he could help, and Talbird asked him to find out about the installation of telephones for the prospective new company. Parent made inquiries and made a deposit with the telephone company after he, Talbird and Davidson had resigned from ORI.

Reviewing this testimony, and the other testimony marshalled by ORI, in the light most favorable to the appellees, it can be taken as meaning no more than that Davidson and Talbird, prior to their resignations, had formed an intent to resign from ORI and to form a competing company. Because of their close professional associations with Coca-Cola and Southern Railway, and the personal nature of operations research, they had strong hopes, which later materialized, of getting work from these concerns after the resignations. Application for a bank loan based on such hopes or inquiries looking to the establishment of an office do not necessarily mean that any assurance had been received from any ORI customers that this work would be forthcoming or that any solicitation whatever had been made. The judge believed the express denials of the appellees involved. He had ample opportunity to judge the credibility of these witnesses, and he also had before him the deposition of Eisenberg, the representative of Coca-Cola in charge of the work, who expressly denied there had been any solicitation before the resignations. The reliance of the lower court on this testimony is not to be deemed erroneous because other testimony is susceptible of a contrary inference.

ORI suggests that the deposition of Laurence Rambo Cowart, another employee of Coca-Cola, does not negative a so-

licitation. Cowart had been an employee of ORI, working under Davidson and Talbird, until in October, 1963 he left ORI to take a position with Coca-Cola with ORI's knowledge and consent. Cowart's deposition was taken by ORI. He testified that in July or August of 1964 he was present in the Coca-Cola offices in Atlanta at a conference with Eisenberg, Davidson and Talbird. Talbird and Davidson said that they were generally dissatisfied with ORI. Cowart did not remember if they said they intended to resign. He first learned that Davidson and Talbird were setting up their own firm after they resigned from ORI. The effect of the deposition is, as Judge Pugh stated, that Cowart, like Eisenberg, was not solicited prior to the resignations of both Davidson and Talbird.

During the fall of 1964, ORI was completing its current work for Southern Railway, as it was for Coca-Cola. All ORI work for Southern had been under Talbird's supervision in his capacity as program director for ORI's commercial work. Southern had wanted Talbird to take personal employment with it. Talbird denied any solicitation of Southern Railway while he was working for ORI and Judge Pugh found that ORI had not proved any such solicitation. ORI attacks this finding as inconsistent with the admitted circumstances, as it does in respect of the finding that there was no solicitation of Coca-Cola, and relies on some of the same items of evidence, as well as others.

Among other matters, ORI stresses the timing of Davidson's and Talbird's resignations just as ORI's 1964 work for Southern had been completed. Viewed in the aspect most favorable to the appellees, this testimony may be interpreted as an endeavor by Davidson and Talbird not to interfere with ORI's existing contracts. ORI points to Talbird's written proposal to Southern and to Talbird's telephone call to Southern's Assistant Vice-President Thorpe immediately after Talbird's resignation, and Thorpe's request for a proposal, which was promptly delivered by Talbird on behalf of the new enterprise. ORI argues the probability of some pre-arrangement because of Thorpe's availability in person late on a Saturday afternoon and his failure to ask any questions about the non-existent corporation. This is inference, not proof. Southern knew, previously,

that Talbird and Davidson were dissatisfied with their employment and might resign; under the law, the communication of this information of itself was not improper. On December 7, Thorpe accepted the proposal insofar as it applied to Talbird and Albert Jankowitz, another appellee and former ORI employee, who had been engaged on the Southern Railway work, and, on the same day, Talbird went to Southern's Atlanta office where Jankowitz joined him. Business energy and initiative by former employees in securing work after their employment has been terminated are not synonymous with treachery during the employment. It is clear, from the record, that Southern Railway, like Coca-Cola, worked closely with the particular individuals whom they felt most capable of dealing with their problems and that, in a sense, ORI had only been a conduit through which those services were rendered. Prompt acceptance of the services in a more direct relationship after the former arrangement had been terminated falls short of proof that the acceptance was pre-arranged.

ORI contends that instead of considering these and other circumstances on the issue of prior solicitation by Talbird of Southern's business, the court below relied on a letter from Southern's president, D. W. Brosnan, written to Cook on July 26, 1965, which ORI argues was improperly admitted over timely objection. The letter is a polite refusal, on advice of counsel, voluntarily to make available either testimony or documentary material to either side in the litigation and a statement of intent to work with either or both groups, as may appear to be in Southern's interest. The letter refers to Southern's decision in the fall of 1964 to take a different approach to the car distribution problem on which ORI had been working for it, and to Southern's interest in the service of particular individuals; there is ample testimony, apart from the letter, to the same effect. Assuming, *arguendo*, that the letter was improperly admitted as a part of ORI's business records, it is apparent to us, from Judge Pugh's opinion, that it was not the letter (which he did not include in his consideration of the sworn testimony) but the lack of affirmative proof of prior solicitation and the denials by the appellees upon which he basically relied in making his factual finding.

Our review of the record fails to convince us that the lower court, in finding that none of the appellees, prior to their resignations, solicited any customers of ORI, was clearly erroneous.

ORI argues that the findings of the lower court on both the issues of solicitation of customers and other key employees are in conflict with the decisions in *C-E-I-R* and other cases. This argument will be considered in a subsequent portion of this opinion.

## Solicitation of Employees

The court below found as a fact that the individual appellees did not solicit ORI's employees either while Davidson and Talbird were employed by ORI or after their employment ended, but that "such employees sought out Davidson and Talbird and were anxious to work for them." Again, we find that these factual conclusions were supported by substantial evidence and were not clearly wrong.

Davidson was in charge of ORI's Logistics and Operations Division, to which substantially all of its commercial work was assigned; Talbird was program director of that division. Davidson resigned from ORI at the conclusion of a management control meeting on Friday afternoon, December 4, Talbird resigned the next morning, Saturday, December 5. Cook called a meeting of all ORI's commercial section employees within two hours; the nature of that meeting has been set forth. That afternoon, most of the other individual appellees and nearly all the other employees in ORI's commercial section gathered at Davidson's residence. Jankowitz asked whether the new concern would accept employment applications and was given an affirmative answer. All but two of those who came wrote employment applications to the new firm; those two, who are among the individual appellees, became employees of the new concern within a few days. With the exception of one man who was not called by either ORI or the appellees, each applicant testified that no appellee solicited his application. Davidson and Talbird testified to the same effect. The applications were made without specifications as to salary or type of work.

ORI points to the fact that virtually all the employees of its commercial division came to Davidson's house immediately after he and Talbird had resigned and asked for employment with

the proposed new enterprise as strong evidence that there must have been prior solicitation by the individual appellees of other key employees before the resignations. But the argument cuts both ways. The mass resignations and the requests for employment with Davidson and Talbird in the company they were going to form can also be interpreted as evidencing concern of the employees about their future with ORI without Davidson and Talbird and confidence in the ability of those two men to form and conduct a successful new operation in which the prospects of the employees would be brighter.

There is much testimony in the record to support this interpretation. Clearly, the other employees in the commercial division had known, for some months, of Davidson's and Talbird's dissatisfaction with the ORI management. During the fall of 1964, ORI had no commercial work other than that it was then completing for Coca-Cola and Southern. The other employees in the division of course were aware of the close professional and personal association of Davidson and Talbird with these two concerns; an assumption that, if Davidson and Talbird left ORI, the two companies would become their customers, was reasonable. There was testimony that the employees were concerned about their future with ORI if and when Davidson and Talbird resigned; they had no term employment. It was Cook who announced the resignations; news that some of the employees were going to Davidson's house quickly spread after that meeting, and it was not unnatural under the circumstances that a general gathering developed. That no terms of individual employment were spelled out in the applications may well be taken only as evidencing the confidence of the employees in the men under whom they had worked and in the probabilities of success of the proposed new enterprise.

Parent's conversation with Talbird a few days before the resignation about being "tired", in which Parent testified Talbird told him there was the probability that Talbird and Davidson were going to leave ORI and start a corporation does not, of itself, prove solicitation. An announcement of intent to leave, particularly when, as here, the dissatisfaction had been known, may, permissibly, plant a seed but is not evidence of its watering. Nor does the fact that Parent, on the afternoon of Decem-

ber 4, apparently immediately after Davidson's resignation, made an inquiry to the telephone company for service to a consulting and research firm in Bethesda that would employ 10 to 12 people, necessarily mean that Davidson and Talbird knew the new company would have that number of employees. The telephone company was not asked to make actual installations until December 7.

There was testimony on behalf of ORI that, on December 3 or 4, Jankowitz had told several employees the names of other men who had agreed to join the proposed firm and the date of their probable resignations. Jankowitz testified that he had been dissatisfied during the last 14 months of his employment by ORI and had discussed his possible resignation with a number of his co-employees. He denied knowing of any other employees who would go with the new organization before he himself made application after the resignations, and explained his reference to a drastic change in December on the basis that December is the time for changes in ORI and that every year people quit or were fired at that time. In his comment on this phase of the evidence, Judge Pugh pointed out that while Jankowitz admitted that he had talked about leaving ORI with other employees, and while seven of ORI's witnesses testified they had talked to Jankowitz, "[n]one of these seven testified that the defendants, Davidson and Talbird, offered them positions with the new corporation or solicited them to come with the new corporation."

In his opinion, on the general issue of solicitation, Judge Pugh said:

> "Even if the plaintiff's evidence alone were sufficient to establish a prima facie case, the defendants called sixteen witnesses, being the four defendants and twelve other witnesses, including the witness Fuchs, the plaintiff's co-counsel who was called primarily to form the basis for the introduction of O. R. I. records, all of whom except Fuchs, deny the allegations of solicitation of the plaintiff's employees and any conspiracy to harm the plaintiff. Such evidence on the part of the defendants therefore leaves little doubt on the proof of the issues herein."

The Judge's belief in the credibility of the appellees' witnesses is evident and that is a belief to which we give weight.

### Other Alleged Acts in Violation of Duties

ORI contends that the individual appellees breached the duty of loyalty which they owed ORI and violated the trust which the employment relationship imposed in other ways, including the secrecy in which the appellees kept their plans to compete, their alleged usurpation of experience gained during their employment and of studies made therein, and the alleged improper removal by several of the appellees of copies of reports made to customers. Judge Pugh found that "nothing that the defendants, Davidson and Talbird, did amounted to larceny or piracy," and concluded from the evidence, that no conspiracy between the appellees, or breach of trust or fidelity had been established.

As to the secrecy in which Davidson and Talbird kept their plans to establish a competing company after their resignations, we find no duty which they had, under the circumstances, to disclose their intentions. Their dissatisfaction with their employment was not concealed. They had no fixed term of employment; ORI had the right to discharge them at any time and they had the right to resign without notice.

It is true that at the ORI management meeting on December 4, Davidson, although intending to resign at the end of the meeting, said that there were no problems as to the prospective Coca-Cola and Southern Railway business for 1965. Davidson's explanation of these statements is that he wished to tender his resignation to Cook personally and could not do so until the end of the meeting. Davidson might well have asked that the meeting be adjourned, so that he could tender his resignation before he made the statements, but he revealed the true situation before the end of the afternoon and ORI was not prejudiced.

The extent to which an employee may properly use experience and data which he has acquired during his employment to compete with his former employer when his connection has terminated is, like many judicial determinations, a matter of balancing of interests. Restatement (Second), *Agency* § 396

(1958), states the general rule as follows: "Unless otherwise agreed, after the termination of the agency, the agent * * * (b) * * * is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent; * * *" The Comment on Clause (b) reads, in part, as follows:

> "b. The duty of an agent not to compete with the principal by using for his own purposes unique assets of the business such as trade secrets, which are frequently of great value as long as they remain secret, does not terminate with the employment. Such assets a former agent cannot properly use for his own purposes. On the other hand, during his agency, an agent frequently acquires information concerning the methods of his employer in doing business and becomes acquainted with his employer's customers and their desires. Information of this sort is barred from use in competition with his employer only to the extent that, considering all the circumstances, it would be unfair to his former employer for the agent to use it. In determining this, the desirability of permitting employees to be free to terminate the relation and the fact that often their chief assets after such termination consist of the special skill and knowledge acquired during the relation are factors to be considered * * *"

Davidson and Talbird each brought to ORI their professional abilities and skills. Undeniably, they contributed to ORI's success and also benefited from their experiences with it. When they resigned, they could not reasonably be expected to blot out what they had learnt during their period of employment, any more than a lawyer who leaves a firm can be required not to avail himself of what he has learnt during the association, including the needs of particular clients by whom he may be subsequently retained without violation of any ethical standards, if there had been no solicitation during the lawyer's previous association.

Dr. Kimball, vice-president of Arthur D. Little, Inc., a large

operations research organization, who was called by ORI, testified, in answer to a question of the court, that he knew of no reason why he could not resign from his company that day and go to work for one of the company's customers, taking with him the knowledge of the customers he had gained while with his company. There would be nothing improper or unethical, in his opinion, in using all the information his company had gained about the company and he could properly continue with the project as an employee of the customer.

Cook, momentarily at least, recognized the large part his key employees had played in the development of the business with particular customers. He testified that when told by Talbird, upon the latter's resignation, that he and Davidson intended to take Coca-Cola and Southern business, he said "Joe, you have done a real good job on both of those contracts and I suppose you are entitled to take them with you." (Talbird testified he only told Cook there would be no problem about ORI's pending work and denied any statement to the effect that he and Davidson had already obtained the Coca-Cola and Southern business). A few minutes later, Cook said he did a "double-take" and decided to fight to retain the business, but his first reaction evidences the important contributions that Davidson and Talbird, through their professional skills and efforts, had made. The situation here presented, where there was no trade secret and the work, in essence, was a combination of professional skills focused upon specific customer needs, is essentially different from that in *Space Aero,* where, 238 Md. at 114-15, we quoted with approval the findings of the trial judge (who, as here, was Judge Pugh) that the defendants had "learned all there was to know from the plaintiff" and that the knowledge how to set up a business and manufacture the hose involved "came to their knowledge while they were employed by the plaintiff."

The use of forms of proposals, with which the appellees were in any case familiar, and the retention by the appellees Sheehan and Carswell of copies of reports they had written or in which they had participated in connection with the Coca-Cola work were not proved to be violations of ORI instructions. Some of the testimony indicates that extra copies of such re-

ports were prepared by ORI to be retained by the employees who had worked on them as their individual property. While contrary testimony was offered by ORI, the question was one of fact.

ORI contends that Davidson and Talbird violated their duties to their employer in failing to submit proposals to Coca-Cola on behalf of ORI for the 1965 work. Davidson testified that Eisenberg called for proposals only when he wanted them, generally in December or January. Cook called Eisenberg on December 8, after the resignations, and assured him that ORI wished to have the 1965 work as it had been planned and suggested coming down with a new team. Eisenberg told Cook he would be happy to have Cook do this and to submit a proposal. Cook did not go to Atlanta and no proposal by ORI was submitted. Coca-Cola, a week or so later, entered into a contract with the new company.

More significant then these matters, in our opinion, on the general issue of the recognition by the individual employees of their obligations to ORI, even during the few months preceding their resignations, is the undisputed testimony of Davidson as to what he did to secure work for ORI for the ensuing year, even though he then intended to resign and to help form a company to compete with it. During that period, projects on which he worked, he testified, resulted in contracts for ORI totaling about $600,000 with three concerns alone. ORI, he said, is now carrying on this work; he did not solicit any of it for his new company.

The conclusions of the lower court on all these matters were mixed determinations of fact and law. Our study of the evidence leads us to an affirmance of its conclusions.

### Cases Cited by Appellant

ORI urges that, taken as a whole, the conduct of the individual appellees while in its employ shows a pattern of conduct incompatible with the duty of loyalty which they owed. It contends that, under the decisions of this Court and decisions in other jurisdictions, on the record as a whole, the court below was in error in denying ORI the equitable relief it prayed.

In this contention, the appellant relies heavily upon *C-E-I-R*.

That case has some factual elements similar to this. The appellant company there, like the appellant company here, was a service corporation providing expert consultants to business, industry and government to assist in the analysis, design and programming of data processing systems. The individual appellees in that case, as in the case at bar, were key men. In *C-E-I-R,* there was testimony that the individual appellees planned to resign and form a competing concern with other key employees, that the new company, after the resignations, submitted a bid to one of C-E-I-R's important customers, the United States Bureau of Old Age and Survivors Insurance, with which the individual appellees had been working for C-E-I-R, and that these appellees, in bidding on the contract for their new company, used experience and information obtained while they were employed by C-E-I-R. However, in other vital respects, the factual situation presented in *C-E-I-R* differs from the one now before us. In *C-E-I-R,* the individual appellees, during the employment, not only told the United States Bureau with which they had been working for their employer of their intent to resign and form a competing company, but actively solicited the business for the company they planned to form. The two principal individual appellees in *C-E-I-R,* during their employment, recruited other key employees of the company for their proposed company without C-E-I-R's knowledge. There was a written contract between C-E-I-R and the principal individual appellees which provided that, during and after their employment, they would not disclose any data or information relating to their work with C-E-I-R.

In *C-E-I-R* we reversed the decision of the lower court dismissing the bill of complaint because we found the court below had entirely relied on an erroneous legal theory. In delivering the Court's opinion, Judge Sybert said, 229 Md. at 367: "There would appear to be no precise line between acts by an employee which constitute mere preparation and those which amount to solicitation. However indefinite that line may be, we feel that the appellees crossed over the line into the area of solicitation forbidden to the loyal employee." The court found that there had been wrongful solicitation during employment. It also found there had been wrongful use by the corporate ap-

pellee of information obtained by the former employees, in violation of their written agreement not to disclose information of this nature, and that the principal individual appellees had, while in C-E-I-R's employment, secretly recruited other key employees. In the present case, we have sustained the factual findings of the lower court that there was no solicitation or recruitment. There were no restrictive covenants. Taken out of the context of these factual distinctions, some of Judge Sybert's language seems appropriate to the present case, but, because of the factual differences, we do not regard *C-E-I-R* as controlling.

In *Ritterpusch* we held that there was evidence to permit the case to go to the jury on the question of whether the appellant had violated his obligation as an employee by soliciting the business of customers of his employer while still employed by the appellee. Here, we have found there was evidence to support the finding of the lower court that there was no such solicitation. In *Ritterpusch* as in *C-E-I-R,* we referred to the right of the employee, before the termination of the employment, to make arrangements to compete thereafter. In *Ritterpusch,* 208 Md. at 600, we approved a charge to the jury that an employee, while still an employee, has the right to advise the customers with whom he has been in contact of the proposed termination of his employment.

We have referred, in other sections of this opinion, to the distinguishing factors between this case and *Space Aero*. We note, in the present case, that while ORI originally believed, mistakenly (although in good faith), that the individual appellees had wrongfully taken a number of important documents relating to the Coca-Cola and Southern Railway work, it was subsequently found that these documents had always remained in the possession of ORI or its agents. In *Space Aero,* the wrongful taking by some of the former employees of drawings and other material was one of the elements which strengthened the conclusion that, in availing themselves of their employer's trade secret, the former employees knew they were acting in violation of their duty of loyalty, 238 Md. at 116-17.

*A. S. Rampell, Inc. v. Hyster Co.,* 3 N. Y. 2d 369, 377, 144 N. E. 2d 371, 165 N. Y. S. 2d 475 (1957), involved the sufficiency of causes of actions as set forth in the plaintiff's amended

bill of complaint. The plaintiff was a dealer-distributor; the defendants were a manufacturer of industrial and other trucks and a salesman of the plaintiff. The second cause of action, referred to by ORI, was summarized by the court as follows:

> "These actions on his [the salesman defendant's] part were not, as claimed, merely planning for new employment after leaving plaintiff's employ; they were acts committed on the time of his employer, and intended to interfere with then existing agreements between his employer and other employees, and between his employer and Hyster, and participation in a plan deliberately designed to destroy his employer's business."

The case is not apposite on the facts here presented.

*Byrne v. Barrett,* 268 N. Y. 199, 197 N. E. 217 (1935), held that the plaintiffs, a firm of real estate brokers, were entitled to recover commissions earned by the defendant, a salesman employed by them on a contract terminable at will. The defendant, while with the plaintiffs, found a prospective client, resigned from the firm, and later recovered commissions for services rendered to the client after his resignation. In that case, however, the defendant had given the plaintiffs only limited casual information as to the status of the negotiations, and the plaintiffs were given to understand, incorrectly, that nothing had been accomplished and consummation of the transaction seemed impossible. Unlike the present case, the plaintiffs, because of a breach of the defendant's duty, were put in a position of not realizing that the transaction could be consummated. In *Robinson Electronic Supervisory Co. v. Johnson,* 397 Pa. 268, 154 A. 2d 494 (1959), the court affirmed the chancellor's finding that the defendants, former employees of the plaintiff, after the severance of their employment, used data of the defendants. The court regarded the data as being in the nature of a trade secret. *Harry R. Defler Corp. v. Kleeman,* 19 App. Div. 2d 396, 400, 243 N. Y. S. 2d 930 (1963), *appeal dismissed,* 13 N. Y. 2d 1174, 248 N. Y. S. 2d 53 (1964), involved defendants who had had no previous experience in their employer's business and who, while still in the employ of the plaintiff, improperly used their employer's confidential compilation of information as to the particular needs of a large number of customers. The

court said further: "Their audacity probably reached its peak when they paid, with plaintiff's funds, the legal fees incurred in connection with the incorporation of Carchem [their competing firm]." Again, the facts were dissimilar to those in the present case.

*Community Counselling Service, Inc. v. Reilly,* 317 F. 2d 239 (4th Cir. 1963) held, as did *Ritterpusch,* that an employee has no right to solicit business from his employer's customers before termination of his employment. Other Federal and New York cases cited by ORI present different factual situations from those here involved. In *E. I. DuPont de Nemours and Co. v. American Potash and Chemical Corp.,* 41 Del. Ch. 533, 200 A. 2d 428 (1964), cited in the appellant's reply brief, trade secrets were involved. The chancellor had granted a preliminary injunction and the defendants (the former employee and a competing corporation he had joined) moved for summary judgment. The chancellor denied the motion and set the case for trial. Unlike the present case, there were no findings of fact after a full hearing. The language of eminent judges quoted in ORI's brief well states the principles of loyalty owed by an employee to his employer; the quotations are pertinent to the facts with which the courts were dealing.

ORI contends that, once the fiduciary relationship between the individual appellees as employees and their employer had been established, the burden of proof shifted to the appellees to show they did not breach their fiduciary duties. The burden of proof rests on the party who has the affirmative of the issue. *Brosius Dev. Corp. v. City of Hagerstown,* 237 Md. 374, 383, 206 A. 2d 571 (1965) ; *Burgess v. Lloyd,* 7 Md. 178, 196-97 (1854). In some circumstances, the duty of going forward with the evidence may shift to the other side. *Rolling Inn, Inc. v. Iula,* 212 Md. 596, 600, 130 A. 2d 578 (1957) ; *District Hghts. Apts. v. Noland Co.,* 202 Md. 43, 50-51, 95 A. 2d 90 (1953) ; *Ross Transport, Inc. v. Crothers,* 185 Md. 573, 584, 45 A. 2d 267 (1946) ; *Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598, 606 (1875). See also *Cummings v. United Artists Theater Circuit, Inc.,* 237 Md. 1, 24, 204 A. 2d 795 (1964). But the burden of proof remains. See Thomsen, *Presumptions and Burden of Proof in Res Ipsa Loquitur Cases*

*in Maryland,* 3 Md.L.Rev. 285 (1939), and 9 Wigmore, *Evidence* § 2485 (3d ed. 1940).

Assuming, *arguendo,* that, in this case, the burden of going forward with the evidence shifted to the appellees, they met the burden. Judge Pugh, in his opinion, concluded that the appellees, by their own testimony, had left "little doubt of the issues herein."

There are interests of public policy as well as of private rights to be balanced in the category of cases in which this litigation falls. It is important to our economic system as well as to employers that proprietary interests of businesses be properly protected; it is important to the free competition basic to our national development as well as to the individual rights of employees who want to go into business for themselves that their spirit of enterprise be not unduly hampered. It is the facts in the particular case which weight the scales. In this case, we have examined the record in the light of all the contentions the appellant has made, and have found the basic facts determined by the lower court to be supported by substantial evidence. We hold that no breach of trust or fidelity owed by any of the appellees, conspiracy, or other act entitling the appellant to equitable relief has been proved.

### The Appellant's Motion

The appellant filed a motion that this Court decide the issues only on the appellant's brief and on the oral argument, because of the appellees' late filing of their brief and appendix under Maryland Rule 830 a and e. We withheld action on the motion pending arguments on the merits.

Action of the Court under the Rule is discretionary. *Swift v. State,* 224 Md. 300, 303, 167 A. 2d 762 (1961) and *Foster-Porter Enterprises, Inc. v. DeMare,* 198 Md. 20, 38, 81 A. 2d 325 (1951). The appellees' brief added little to the argument that had been made before Judge Pugh, as his opinion shows, except for some review of the testimony to support the findings of the lower court. The lateness of the filing did not prevent the preparation and filing of an able reply brief by the appellant. Because there has been no prejudice to the appellant or impediment to the Court's schedule caused by the default, the motion will be denied. *Swift* and *Foster-Porter, supra;* see also,

*Government Employees Insurance Co. v. Coppage,* 240 Md. 17, 22, 212 A. 2d 523 (1965) and *Mayor and City Council of Baltimore v. Borinsky,* 239 Md. 611, 617, 212 A. 2d 508 (1965).

However, we are of the opinion that the filing of the appellees' appendix, which also was filed late, is to be considered in the matter of the awarding of costs. This appendix consists of 341 printed pages; the cost of printing, per page, was higher than the per page cost of printing the record extract, and there is some duplication. Moreover, the appendix consists of extracts from the testimony of witnesses, other portions of whose testimony was set forth in the record extract, so that the Court, in reviewing the evidence, has been forced, at considerable inconvenience, to piece together the contents of the three formidable separate volumes. Maryland Rule 828 c provides, in part: "Whenever possible, the parties shall by stipulation agree on the parts of the record to be included in the printed extract." The only explanation of counsel for the appellees for the failure to reach an agreement on a joint extract was that there was a "misunderstanding" between counsel as to the parts of the record to be included in a joint appendix; no reasons for the "misunderstanding" were given.

Rule 882 a provides: "In all cases in this Court the awarding of costs shall be in the discretion of this Court, but unless it is otherwise ordered by this Court costs shall be awarded against the losing party." We have exercised our discretion under this Rule where we deemed it proper under the circumstances. *Moser v. Board of County Comm'rs of Howard County,* 235 Md. 279, 284, 201 A. 2d 365 (1964) and *Reese v. Mandel,* 224 Md. 121, 130-31, 167 A. 2d 111 (1961).

The cost of printing the appellees' appendix was $2334.50. This amount of the costs is to be paid by the appellees; the remainder of the costs is to be paid by the appellant.

> *Motion of appellant denied; decree affirmed; costs to be paid by appellant, except that the cost of printing the appellees' appendix, in the amount of $2334.50, shall be paid by appellees.*