**MILTON E. RAYFIELD & CO., Inc., and Milton E. Rayfield (individually)**

v.

**WATSON SEAFOOD & POULTRY CO., Inc., and Anthony B. Brannock.**

**Civ. No. 1820.**

United States District Court
E. D. North Carolina.

May 18, 1967.

\* \* \* \* \*

John V. Hunter, III, and Sanford, Cannon & Hunter, Raleigh, N. C., for plaintiffs.

Herman Wolff, Jr., Raleigh, N. C., for defendants.

THOMSEN, District Judge, sitting by designation.

Plaintiffs seek an injunction and damages against defendants based upon plaintiffs' claim that defendants intentionally caused or assisted E. William Welsch, an alleged agent of plaintiffs, to violate his duty of loyalty to plaintiffs.[1] Defendants deny every essential element of plaintiffs' claim. They question the alleged relationship between Welsch and each of the plaintiffs, and assert that whatever relationship had existed was terminated before defendants dealt with Welsch, that Welsch owed no duty to plaintiffs not to compete with them at the time he sought defendants' business, and that defendants did not intentionally assist Welsch in violating any duty he owed plaintiffs.

### Facts [2]

The individual plaintiff (Rayfield) has been in the food brokerage business for twelve years, seeking to obtain contracts for various companies from the commissary systems of the United States Armed Forces in Europe. At first he was employed by other food brokerage firms, but in 1963 decided to organize his own firm in Frankfurt am Main, Germany. In the spring of that year, Welsch, who had had some experience in the field and whom Rayfield had known for some years, joined the firm, as did a man named Roussos. The relationship among the three men was vague; there was no written agreement. Rayfield testified that he regarded Welsch as an employee; Welsch testified that he considered Rayfield the senior partner and himself and Roussos partners. Welsch had a drawing account of $500 a month. The venture was not profitable, and for considerable periods Rayfield did not draw any money. Welsch and Roussos urged Rayfield to formalize their relationship, and when Rayfield refused or failed to do so Roussos pulled out, sometime in 1964. About the same time Rayfield returned to the United States and worked briefly for another company, to relieve pressure on the firm's finances, while Welsch remained in charge of the operations in Europe. At that time the firm represented a number of accounts for paper, starch, popcorn, shrimp and other products, but had no poultry account.

Some one hundred commissary stores in Germany, known as the Giessen system, buy their stock from a list approved by a Board, which meets in March and September of each year to select the items to be placed on the approved list. The brokerage firms present their clients' products to the Board, and spend about three months before each meeting "preselling" their clients' products to officers who are prospective members of the Board.

1. Jurisdiction is based on diversity of citizenship, both plaintiffs being citizens of Virginia and both defendants being citizens of North Carolina. The original complaint was filed by plaintiff corporation alone against defendant corporation and "Watson Poultry & Export Co.", which proved to be the trade name under which defendant corporation carried on its expert business.

2. Some evidence was taken subject to exception. Defendants' motions to strike are overruled; plaintiffs' motion to strike all reference to the Mafia is granted. Plaintiffs' objection to defendants' effort to require plaintiffs to introduce all of the deposition of the defendant Brannock, in view of Rule 26(d) (4), F.R.Civ.P., is overruled, but since Brannock testified and was fully examined by counsel for each side, neither side would be prejudiced by an adverse ruling on this point. The Court has considered all the arguments made and the evidence adduced with respect to the credibility of the several witnesses, all of whom are emotionally as well as financially involved in the case.

On October 5, 1964, at Frankfurt, Rayfield and Welsch signed an agreement which provided:

"We, the undersigned agree to ownership of M. E. Rayfield and Company, Inc. as follows.

"1. M. E. Rayfield, Jr. owns 75 (seventy-five) percent of total shares.

"2. E. W. Welsch owns 25 (twenty-five) percent of total shares.

"3. In consideration of services already rendered, E. W. Welsch has fully earned 25 (twenty-five) percent of total shares.

"4. E. W. Welsch is entitled to buy up to 24 (twenty-four) percent more of the available stock of M. E. Rayfield and Company shares at a fair estimate of the company worth.

"Agreed to and signed this date, October 5th, 1964 at Frankfurt on the Main, Germany."

Rayfield then returned to the United States, met the individual defendant (Brannock), the export sales manager of the corporate defendant (Watson) at the Florida Food Show, and solicited the Watson account. Watson had previously submitted some of its products to the Board in Germany but none had been accepted. In December 1964 Rayfield visited the Watson office in Raleigh and again solicited its business. On January 12, 1965, Brannock, on behalf of Watson, wrote Rayfield as follows:

"This is to serve as a letter of authorization naming your firm to act as our sales agent in Germany. This agreement will be valid so long as you satisfactorily perform the duties inherent in the authorized capacity and a profit is realized by both parties. Upon thirty day's notice the aforementioned agreement can be severed. Thank you."

The parties agreed orally to the customary brokerage commission of 4%.

On January 8, 1965, Rayfield had caused the corporate plaintiff to be incorporated in Virginia, and in February he drew up and signed a stock certificate for 25% of the stock in Welsch's name but did not deliver the certificate to Welsch. On March 26, Rayfield, as president of the corporate plaintiff, executed a power of attorney appointing Welsch its attorney in fact "for the purpose of establishing a branch office in Germany in accordance with the proper and necessary local requirements". Welsch then had a drawing account of $800 a month if the money was available. The principal corporate bank account was in Virginia, subject only to Rayfield's signature, but a "revolving account" was opened in a Frankfurt bank to cover the expenses of the German office. Welsch had the right to draw on that account.

At the March 1965 meeting of the Board, a dozen or so Watson products were presented and two were accepted, namely, whole cut-up friers and livers. Before November 1965, orders in the amount of $106,497.38 were received by Watson, and Watson sent Rayfield $4,110.50 for commissions.

Several weeks before the meeting of the Board early in September, Brannock came to Germany to assist Rayfield and Welsch in the interviews and other work preparatory in presenting Watson's products to the Board. It was agreed that Rayfield would make the presentation, but at the final meeting among Rayfield, Welsch and Brannock, when the details of the presentation were discussed, Rayfield fell asleep and was not adequately prepared for the meeting. Rayfield made a poor presentation; the two Watson items which had been approved in March were dropped and no Watson items were approved at that meeting of the Board. Brannock was dissatisfied with Rayfield's presentation.

As the year 1965 progressed, Welsch had become increasingly disturbed by Rayfield's failure to deliver his stock certificate and Rayfield's conflicting statements with respect to the corporation. In the middle of September the Frankfurt office had unpaid bills for more than

$2,000, Welsch was behind in his draw, and owed substantial sums for the personal expenses of himself and his family. After an unsatisfactory interview between Rayfield and Welsch at Cologne in late September, Rayfield returned to Virginia with a check for $12,000 from Singleton Packing Company for commissions. Welsch telephoned from Frankfurt to Rayfield at Virginia Beach on October 5. They discussed their problems, and Rayfield said he would mail money and the stock certificate immediately. Neither the money nor the certificate had arrived by October 11, so Welsch again called Rayfield and delivered an ultimatum, stating there was no point in continuing the relationship unless Rayfield immediately sent the stock certificate and money. Rayfield failed to do so, and Welsch decided he could no longer continue to work with Rayfield. Welsch then called Brannock and the Singleton Packing Company, which had theretofore offered to employ him in its organization. Welsch told them that he was leaving Rayfield and discussed with them the possibility of handling their accounts.

On October 16 Welsch flew to Tampa, Florida, and succeeded in obtaining the Singleton account for himself. On October 21 Welsch flew from Tampa to Raleigh, discussed his problems with Brannock and sought the Watson account. He told both Brannock and Brannock's father-in-law, Watson, Sr., that he had left or was leaving Rayfield. Welsch rode with Brannock to Waynesboro, Virginia, in order to drive a second car back to Raleigh, and Brannock accompanied Welsch when Welsch visited the Mt. Olive Pickle Company seeking its account, although Brannock did not participate in the discussions. Welsch told Brannock that after the September meeting of the Board he had succeeded in persuading the Board chairman to approve Watson's whole cut-up friers, pro-

vided they were packaged differently, and also to approve Watson's chicken roll.[3] Welsch left Raleigh on October 26. Rayfield learned that Welsch would be at the Washington Airport that afternoon, went to Washington, had Welsch paged, and talked to him for a half hour or so.

It is difficult to tell what transpired during that conversation. Rayfield certainly knew or learned that Welsch was soliciting the firm's accounts, because Rayfield met Brannock at the New York Food Show on October 31–November 1 and tried to persuade Brannock to remain with Rayfield, rather than to go with Welsch. It is noteworthy that neither Rayfield nor Brannock testified that Rayfield intimated to Brannock that Welsch was violating any duty either to Rayfield or to plaintiff corporation when he solicited the Watson account. Brannock told Rayfield that he had not yet made up his mind whether to give his business to Welsch. In fact Brannock wished to consult more experienced people before deciding. He had previously checked with another brokerage firm, but it already had a poultry account.

On the evening of November 1 Rayfield flew to Frankfurt. On November 2 he met Welsch at the Frankfurt office. There was an argument about the firm's automobile, which was registered in Welsch's name, as required by German law. Welsch had driven the car hard, and had worn out a set of Michelin X tires in 18,000 miles—an almost incredible performance. When Welsch demurred at turning over the keys, Rayfield, who is 6′ tall and weighs 200 pounds, assaulted Welsch, who is 5′ 7½″ tall and weighs 135 pounds, and beat him up in the presence of two employees. Rayfield took the keys and Welsch signed a letter prepared by and addressed to Rayfield, dated November 1, 1965, which read as follows:

"This is to advise you that I have resigned from Milton E. Rayfield and Company as of 31 October 1965.

3. This testimony was admitted not as evidence of the truth of the statement, but as evidence of what Welsch told Brannock, which is relevant to the issue of Brannock's good faith in preferring Welsch to Rayfield.

"I hereby acknowledge that all Powers of Attorney authorizing me to act on behalf of the company and your personal interests or properties are terminated and no longer valid.

"I also acknowledge that the air fare charged in the name of the company with City passage for round trip to the USA and back is for my personal account and will be paid by me.

"I also agree to deliver all files belonging to the company prior to departure. I understand that you authorize me to obtain copies of necessary material in these files.

"I confirm that the Automobile VW 1500 S (Di cc 838) is company property.

"To the best of my knowledge this covers all of my obligations to the company.

"I hereby relinquish all claims on the Milton E. Rayfield and Company as of this date.

"Signed this date, 2 November 1965 at Frankfurt/Main, Germany."

The next day, November 3, Rayfield received the following cablegram:

"I HAVE DECIDED TO GO WITH BILL IM SORRY GOOD LUCK TONY BRANNOCK"

Shortly thereafter Brannock made an oral agreement with Welsch to represent Watson in Germany, and on November 5 Brannock wrote the Chief of Subsistence, QM Div., H.Q., U. S. Army, Europe, informing him of the "change in representatives as of December 1".

The thirty day notice from Watson to Rayfield called for by the letter of January 12 expired early in December 1965, as a result of the cablegram sent by Brannock to Rayfield on November 2. Before the expiration of the thirty day notice, Watson received orders for items which had been approved at the March Board totaling $23,050.66. These items were shipped in December and commissions totaling $921.35 were paid by Watson to Welsch in January 1966. After the expiration of the thirty day notice, Watson received orders totaling $220,020.61, for which it paid Welsch a 4% commission, totaling $8,799.79, pursuant to the new agreement made by Watson with Welsch in November 1965.

Rayfield received gross commissions of $41,098.31 on European business in 1965, and included the total amount in the corporate income tax return of plaintiff corporation for that year. The return showed no net taxable income, but a small loss, and Rayfield testified that the business was about at the break-even point.

The Watson checks were payable to Rayfield individually, since Watson's contract was with Rayfield. It does not appear whether any of the other accounts were with the plaintiff corporation, or how other commission checks were payable.

Plaintiff corporation did no business in 1966. Rayfield joined forces with one Bisek in a new corporation known as Bisek and Rayfield, for which Rayfield obtained orders for European business resulting in commissions of $26,739 during 1966. Rayfield obtained several new accounts for that corporation, including a poultry account.[4] Particularly in view of the debacle at the September 1965 Board meeting, plaintiffs have failed to prove that either Rayfield or plaintiff corporation would have realized any profit if Rayfield had retained the Watson account. The increased volume of business done by Watson with the commissaries in 1966 was due to the efforts of Welsch.

*Discussion*

Plaintiffs concede that they have found no judicial authority to support the claim which they are making against defendants. Plaintiffs base their case

---

4. In addition to the Watson and Singleton accounts, Welsch had secured the Mt. Olive Pickle account and the Chelsea Milling Company account.

upon section 312 of the Restatement of Agency, 2d, which reads as follows:

"INTENTIONALLY CAUSING OR ASSISTING AGENT TO VIOLATE DUTY.

"A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal."

The comment and illustrations in the Restatement do not refer to any situation remotely like that presented here. This Court is satisfied that the principle stated in section 312 is sound law, but it is doubtful whether it should be applied to subject a customer to liability when his only fault is agreeing with an agent to give the agent his business while the agent was still employed by the principal. Even if the rule stated in the Restatement can ever be carried that far, it would not reach this case.

The relationship between Welsch and Rayfield and between Welsch and the plaintiff corporation is far from clear. The weight of the evidence indicates that Welsch and Rayfield had been partners or joint venturers, and Rayfield's ambivalent attitude and conflicting statements about Welsch's stock certificate cloud the relationship between Welsch and Rayfield's corporation. Plaintiffs cite the duty owed by a sales representative to his employer, as stated in Community Counselling Service, Inc. v. Reilly, 317 F.2d 239 (4 Cir. 1963):

"Employment as a sales representative demands of the employee the highest duty of loyalty. It is not without its difficulties when the employment continues after the employee has arrived at a fixed determination to leave his employment, for then his interests and those of his employer have lost their identity and may have become conflicting. Until the employment relationship is finally severed however, the employee must prefer the interests of his employer to his own. During such a period, he cannot solicit for himself future business which his employment requires him to solicit for his employer. If prospective customers undertake the opening of negotiations which the employee could not initiate, he must decline to participate in them. Above all, he should be candid with his employer and should withhold no information which would be useful to the employer in the protection and promotion of its interests." 317 F.2d at 244.

It is doubtful, however, whether that rule applies to the relationship between Welsch and Rayfield or to the relationship between Welsch and the plaintiff corporation, in view of the history of the dealings between Welsch and Rayfield.

Even if the rule quoted above from *Community Counselling Service* applied to the relationship between Welsch and the plaintiff corporation while it existed, this Court holds that when Welsch's ultimatum to Rayfield on October 11 was not complied with by Rayfield, the relationship between Welsch and the plaintiff corporation was terminated, and Welsch was thereafter free to solicit business in competition with Rayfield and with the corporation.

Moreover, defendants were told by Welsch that he was leaving or had left the Rayfield firm before defendants negotiated with Welsch in Raleigh in October 1965. That fact was confirmed by Rayfield's conversation with Brannock in New York on October 31–November 1, and Watson did not commit itself to go with Welsch until the evening of November 2, when Brannock sent his cablegram, after Rayfield's assault on Welsch and Welsch's letter of resignation dated November 1, effective October 31.

The Court concludes that no tort liability of either defendant to either plaintiff has been proved.

At the conclusion of the evidence it appeared that defendant corporation has a possible contract liability to Rayfield or to plaintiff corporation for brokerage commissions with respect to the two orders placed during November or early

December 1965. Both sides asked the Court to determine whether or not such liability existed and if so the extent of such liability. Based on the facts set out above, the Court concludes that defendant corporation is liable to Rayfield for commissions at the rate of 4% on orders placed before the expiration of the thirty day notice early in December 1965, and finds that orders in the amount of $23,050.66 were placed during that period, resulting in a liability from defendant corporation to Rayfield for $922.03. The Court further finds that all subsequent orders were placed after the expiration of the thirty day period as a result of Welsch's efforts.

 While Welsch was on the stand as defendants' last witness at the trial of this case, counsel for plaintiffs presented to the Court a motion for leave to add Welsch as an additional defendant under Rule 20. The Court reserved ruling on the motion. The record shows that in March 1966, shortly after the original complaint herein was filed, defendant corporation moved to dismiss the complaint on the ground that Welsch was an indispensable party under Rule 19, as it then read, and had not been joined. Plaintiff corporation argued that Welsch was not an indispensable party, and the Court denied the motion to dismiss. Rayfield and Brannock were joined as parties in the amended complaint. All pleadings and evidence considered, this Court concludes that the motion to add Welsch as a party defendant should not be granted, because it would unreasonably delay the decision of this case, would introduce new and

complicated issues between plaintiffs and Welsch, with additional cost to defendants. Moreover, diversity jurisdiction of plaintiffs' claim against Welsch was not sufficiently alleged or proved,[5] and the question of venue would undoubtedly be raised.

Judgment will be entered in favor of Rayfield against defendant corporation in the amount of $922.03, costs to be paid by plaintiffs.

---

5. The motion alleges: "When this action was brought, Welsch, who is a United States citizen, was to the best knowledge of the plaintiffs residing permanently in Germany, and was not within the jurisdiction of any United States court. * * * To the best knowledge of Milton E. Rayfield, Welsch is not and never has been a citizen or resident of the States of Virginia, North Carolina, or Florida." The evidence did show that Welsch is an American citizen but did not show whether he is permanently residing in Germany. See McClanahan v.

Galloway, 127 F.Supp. 929 (N.D.Cal. 1955); Alla v. Kornfeld, 84 F.Supp. 823 (N.D.Ill.1949); Hammerstein v. Lyne, 200 F. 165 (W.D.Mo.1912). See also Van Der Schelling v. U. S. News & World Report, Inc., 213 F.Supp. 756 (E.D.Pa. 1963), affirmed 324 F.2d 956 (3 Cir. 1963), cert. den. 377 U.S. 906, 84 S.Ct. 1166, 12 L.Ed.2d 177 (1964); Pemberton v. Colonna, 189 F.Supp. 430 (E.D. Pa.1960), affirmed 290 F.2d 220 (3 Cir. 1961); Vidal v. South American Securities Co., 276 F. 855 (2 Cir. 1916).